LOCAL 174, TEAMSTERS, CHAUFFEURS, WARE-
HOUSEMEN & HELPERS OF AMERICA, *v.*
LUCAS FLOUR CO.

No. 50.  Argued November 7–8, 1961.—
Decided March 5, 1962.

*Francis Hoague* argued the cause and filed briefs for petitioner.

*Stuart G. Oles* argued the cause for respondent. With him on the briefs was *Seth W. Morrison*.

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner and the respondent (which we shall call the union and the employer) were parties to a collective bargaining contract within the purview of the National Labor Relations Act. The contract contained the following provisions, among others:

"ARTICLE II

"The Employer reserves the right to discharge any man in his employ if his work is not satisfactory.

.        .        .        .        .

"ARTICLE XIV

"Should any difference as to the true interpretation of this agreement arise, same shall be submitted to a Board of Arbitration of two members, one representing the firm, and one representing the Union. If said members cannot agree, a third member, who must be a disinterested party shall be selected, and the decision of the said Board of Arbitration shall be binding. It is further agreed by both parties hereto that during such arbitration, there shall be no suspension of work.

"Should any difference arise between the employer and the employee, same shall be submitted to arbitration by both parties. Failing to agree, they shall mutually appoint a third person whose decision shall be final and binding."

In May of 1958 an employee named Welsch was discharged by the employer after he had damaged a new fork-lift truck by running it off a loading platform and onto some railroad tracks. When a business agent of the union protested, he was told by a representative of the employer that Welsch had been discharged because of unsatisfactory work. The union thereupon called a strike to force the employer to rehire Welsch. The strike lasted eight days.[1] After the strike was over, the issue of Welsch's discharge was submitted to arbitration. Some five months later the Board of Arbitration rendered a decision, ruling that Welsch's work had been unsatisfactory, that his unsatisfactory work had been the reason for his discharge, and that he was not entitled to reinstatement as an employee.

In the meantime, the employer had brought this suit against the union in the Superior Court of King County, Washington, asking damages for business losses caused by the strike. After a trial that court entered a judgment in favor of the employer in the amount of $6,501.60.[2] On appeal the judgment was affirmed by Department One of the Supreme Court of Washington. 57 Wash. 2d 95, 356 P. 2d 1. The reviewing court held that the pre-emption doctrine of *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, did not deprive it of jurisdiction over the controversy. The court further held that § 301 of the Labor Management Relations Act of 1947, 29 U. S. C. § 185, could not "reasonably be interpreted as pre-empting state jurisdiction, or as affecting it by limiting the substantive law to be applied." 57 Wash. 2d, at 102, 356 P. 2d, at 5. Expressly applying principles of state law, the court reasoned that the strike was a viola-

---

[1] The strike was terminated by a temporary injunction issued by the state court.

[2] The amount of damages is not in issue here.

tion of the collective bargaining contract, because it was an attempt to coerce the employer to forego his contractual right to discharge an employee for unsatisfactory work.[3] We granted certiorari to consider questions of federal labor law which this case presents. 365 U. S. 868.

We note at the outset a question as to our jurisdiction. Although the judgment before us has been certified as that of the Supreme Court of Washington, this case was actually heard and decided by Department One of that court, consisting of five of the nine members of the full court. Since the union could have filed a petition for rehearing *en banc* but did not do so, the argument is made that the judgment before us was not "rendered by the highest court of a State in which a decision could be had," and that the judgment is one we therefore have no power to review. 28 U. S. C. § 1257. This argument primarily rests upon *Gorman* v. *Washington University*, 316 U. S. 98, which held that, in view of the structure of Missouri's judicial system, a separate division of the Supreme Court of that State was not the highest state court in which a decision of a federal question could be had.[4] It is evident, however, that the law governing rehearings in the Supreme Court of Washington is quite unlike the particularized provisions of Missouri law which led this Court to dismiss the writ in *Gorman*.

---

[3] The court noted that the unreported memorandum opinion of the trial judge indicated a theory of liability based upon tort, rather than contract, liability. The appellate court said, however: "From the pleadings, the theory is established that the respondent was injured by the appellant's breach of contract and this theory is clearly supported by the record. Therefore, the rule that the judgment of the trial court will be sustained on any theory established by the pleadings and supported by the proof is applicable." 57 Wash. 2d, at 103, 356 P. 2d, at 6.

[4] See also *Osment* v. *Pitcairn*, 317 U. S. 587.

As the opinion in *Gorman* pointed out, the Constitution of the State of Missouri expressly conferred the *right* to an *en banc* rehearing by the Supreme Court of Missouri in any case originally decided by a division of the court in which a federal question was involved. It was this provision of the state constitution which was the basis for the conclusion in *Gorman* that the State of Missouri did not regard a decision by a division of the court as the final step in the state appellate process in a case involving a federal question. "[T]he constitution of Missouri," it was said, "has thus provided in this class of cases for review of the judgment of a division . . . ." 316 U. S., at 100.

By contrast, a rehearing *en banc* before the Supreme Court of Washington is not granted as a matter of right. The Constitution and statutes of the State of Washington authorize its Supreme Court to sit in two Departments, each of which is empowered "to hear and determine causes, and all questions arising therein." [5] Cases coming before

---

[5] Article IV, § 2 of the state constitution provides, in pertinent part, "The legislature may increase the number of judges of the supreme court from time to time and may provide for separate departments of said court."

Revised Code of Washington, § 2.04.120, provides:

"*Two departments—Quorum.* There shall be two departments of the supreme court, denominated respectively department one and department two. The chief justice shall assign four of the associate judges to each department and such assignment may be changed by him from time to time: *Provided,* That the associate judges shall be competent to sit in either department and may interchange with one another by agreement among themselves, or if no such agreement be made, as ordered by the chief justice. The chief justice may sit in either department and shall preside when so sitting, but the judges assigned to each department shall select one of their number as presiding judge. Each of the departments shall have the power to hear and determine causes, and all questions arising therein, subject to the provisions in relation to the court en banc. The presence of three judges shall be necessary to transact any business in either of

the court may be assigned to a Department or to the court
*en banc* at the discretion of the Chief Justice and a speci-
fied number of other members of the court.[6]   The state
law further provides that the decision of a Department
becomes a final judgment of the Supreme Court of Wash-
ington, unless within 30 days a petition for rehearing
has been filed, or a rehearing has been ordered on the
court's own initiative.[7]

We can discern in Washington's system no indication
that the decision in the present case, rendered unani-

---

the departments, except such as may be done at chambers, but one
or more of the judges may from time to time adjourn to the same
effect as if all were present, and a concurrence of three judges shall
be necessary to pronounce a decision in each department: *Provided,*
That if three do not concur, the cause shall be reheard in the same
department or transmitted to the other department, or to the court
en banc."

[6] Revised Code of Washington, § 2.04.150, provides:

*"Apportionment of business—En banc hearings.*   The chief justice
shall from time to time apportion the business to the departments,
and may, in his discretion, before a decision is pronounced, order any
cause pending before the court to be heard and determined by the
court en banc.   When a cause has been allotted to one of the depart-
ments and a decision pronounced therein, the chief justice, together
with any two associate judges, may order such cause to be heard and
decided by the court en banc.   Any four judges may, either before
or after decision by a department, order a cause to be heard en banc."

[7] Revised Code of Washington, § 2.04.160, provides:

*"Finality of departmental decision—Rehearings.*   The decision of
a department, except in cases otherwise ordered as hereinafter pro-
vided, shall not become final until thirty days after the filing thereof,
during which period a petition for rehearing, or for a hearing en banc,
may be filed, the filing of either of which, except as hereinafter other-
wise provided, shall have the effect of suspending such decision until
the same shall have been disposed of.   If no such petition be filed the
decision of a department shall become final thirty days from the date
of its filing, unless during such thirty-day period an order for a hear-
ing en banc shall have been made: . . . .   Whenever a decision shall
become final, as herein provided, a judgment shall issue thereon."

mously by a majority of the judges of the Supreme Court of Washington, was other than the final word of the State's final court.[8]   This case is thus properly before us, and we turn to the issues which it presents.

One of those issues—whether § 301 (a) of the Labor Management Relations Act of 1947 deprives state courts of jurisdiction over litigation such as this—we have decided this Term in *Charles Dowd Box Co.* v. *Courtney*, 368 U. S. 502.   For the reasons stated in our opinion in that case, we hold that the Washington Supreme Court was correct in ruling that it had jurisdiction over this controversy.[9]

---

[8] See *Market Street R. Co.* v. *Comm'n*, 324 U. S. 548, 551–552. In recent years we have, without challenge, reviewed on their merits several cases decided by a Department of the Washington Supreme Court in which no petition for rehearing *en banc* had been filed.   See, *e. g., McGrath* v. *Rhay*, 364 U. S. 279; *Ross* v. *Schneckloth*, 357 U. S. 575; *United States* v. *Carroll Construction Co.*, 346 U. S. 802.

[9] Since this was a suit for violation of a collective bargaining contract within the purview of § 301 (a) of the Labor Management Relations Act of 1947, the pre-emptive doctrine of cases such as *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, based upon the exclusive jurisdiction of the National Labor Relations Board, is not relevant.   See *Local 4264, United Steelworkers* v. *New Park Mining Co.*, 273 F. 2d 352 (C. A. 10th Cir.); *Independent Petroleum Workers* v. *Esso Standard Oil Co.*, 235 F. 2d 401 (C. A. 3d Cir.); see generally *Lodge No. 12, District No. 37, Int'l Assn. of Machinists* v. *Cameron Iron Works, Inc.*, 257 F. 2d 467 (C. A. 5th Cir.); *Local 598, Plumbers & Steamfitters Union* v. *Dillion*, 255 F. 2d 820 (C. A. 9th Cir.); *Local 181, Int'l Union of Operating Engineers* v. *Dahlem Constr. Co.*, 193 F. 2d 470 (C. A. 6th Cir.).   As pointed out in *Charles Dowd Box Co.* v. *Courtney*, 368 U. S., at 513, Congress "deliberately chose to leave the enforcement of collective agreements 'to the usual processes of the law.'"   See also H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. p. 52.   It is, of course, true that conduct which is a violation of a contractual obligation may also be conduct constituting an unfair labor practice, and what has been said is not to imply that enforcement by a court of a contract obligation affects the jurisdiction of the N. L. R. B. to remedy unfair labor practices, as such.   See generally Dunau, Contractual Prohibition of Unfair Labor Practices: Jurisdictional Problems, 57 Col. L. Rev. 52.

There remain for consideration two other issues, one of them implicated but not specifically decided in *Dowd Box.* Was the Washington court free, as it thought, to decide this controversy within the limited horizon of its local law? If not, does applicable federal law require a result in this case different from that reached by the state court?

In *Dowd Box* we proceeded upon the hypothesis that state courts would apply federal law in exercising jurisdiction over litigation within the purview of § 301 (a), although in that case there was no claim of any variance in relevant legal principles as between the federal law and that of Massachusetts. In the present case, by contrast, the Washington court held that there was nothing in § 301 "limiting the substantive law to be applied," and the court accordingly proceeded to dispose of this litigation exclusively in terms of local contract law. The union insists that the case was one to be decided by reference to federal law, and that under applicable principles of national labor law the strike was not a violation of the collective bargaining contract. We hold that in a case such as this, incompatible doctrines of local law must give way to principles of federal labor law.[10] We

---

[10] Of the many state courts which have assumed jurisdiction over suits involving contracts subject to § 301, few have explicitly considered the problem of state *versus* federal law. *McCarroll* v. *Los Angeles County Dist. Council of Carpenters,* 49 Cal. 2d 45, 60, 315 P. 2d 322, 330, held that federal law must govern. Accord: *Local Lodge No. 774, Int'l Assn. of Machinists* v. *Cessna Aircraft Co.,* 186 Kan. 569, 352 P. 2d 420; *Harbison-Walker Refractories Co.* v. *Local 702, United Brick & Clay Workers,* 339 S. W. 2d 933, 935–936 (Ky. Ct. App.). Other courts have found it unnecessary to decide the question, because they found no conflict between state and federal law on the issues presented. *Karcz* v. *Luther Mfg. Co.,* 338 Mass. 313, 317, 155 N. E. 2d 441, 444; *Springer* v. *Powder Power Tool Corp.,* 220 Ore. 102, 106–107, 348 P. 2d 1112, 1114; *Clark* v. *Hein-Werner Corp.,* 8 Wis. 2d 264, 277, 100 N. W. 2d 317, 318 (on motion for rehearing). It bears noting, however, that these courts and others, *e. g., Con-*

further hold, however, that application of such principles to this case leads to affirmance of the judgment before us.

It was apparently the theory of the Washington court that, although *Textile Workers Union* v. *Lincoln Mills,* 353 U. S. 448, requires the federal courts to fashion, from the policy of our national labor laws, a body of federal law for the enforcement of collective bargaining agreements, nonetheless, the courts of the States remain free to apply individualized local rules when called upon to enforce such agreements. This view cannot be accepted. The dimensions of § 301 require the conclusion that substantive principles of federal labor law must be paramount in the area covered by the statute. Comprehensiveness is inherent in the process by which the law is to be formulated under the mandate of *Lincoln Mills,* requiring issues raised in suits of a kind covered by § 301 to be decided according to the precepts of federal labor policy.

More important, the subject matter of § 301 (a) "is peculiarly one that calls for uniform law." *Pennsylvania R. Co.* v. *Public Service Comm'n,* 250 U. S. 566, 569; see *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148, 167–169. The possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements. Because neither party could be certain of the rights which it had obtained or conceded, the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract. Once the collective bargain was

---

*necticut Co.* v. *Division 425, Street & Electric Railway Employees,* 147 Conn. 608, 622–623, 164 A. 2d 413, 420, have carefully considered applicable federal precedents in resolving the litigation before them.

made, the possibility of conflicting substantive interpretation under competing legal systems would tend to stimulate and prolong disputes as to its interpretation.[11] Indeed, the existence of possibly conflicting legal concepts might substantially impede the parties' willingness to agree to contract terms providing for final arbitral or judicial resolution of disputes.

The importance of the area which would be affected by separate systems of substantive law makes the need for a single body of federal law particularly compelling. The ordering and adjusting of competing interests through a process of free and voluntary collective bargaining is the keystone of the federal scheme to promote industrial peace. State law which frustrates the effort of Congress to stimulate the smooth functioning of that process thus strikes at the very core of federal labor policy. With due regard to the many factors which bear upon competing state and federal interests in this area, *California* v. *Zook*, 336 U. S. 725, 730–731; *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230–231, we cannot but conclude that in enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules.

Whether, as a matter of federal law, the strike which the union called was a violation of the collective bargaining contract is thus the ultimate issue which this case presents. It is argued that there could be no violation in the absence of a no-strike clause in the contract

---

[11] As one commentator has said: "Words in any legal document are ambiguous, but the body of law which grows up in an area through decision helps to dispel this ambiguity. The existence of two bodies of law which cannot be accommodated by any conflict-of-laws rule, however, is calculated to aggravate rather than to alleviate the situation." Wellington, Labor and the Federal System, 26 U. of Chi. L. Rev. 542, 557.

explicitly covering the subject of the dispute over which the strike was called. We disagree.

The collective bargaining contract expressly imposed upon both parties the duty of submitting the dispute in question to final and binding arbitration.[12] In a consistent course of decisions the Courts of Appeals of at least five Federal Circuits have held that a strike to settle a dispute which a collective bargaining agreement provides shall be settled exclusively and finally by compulsory arbitration constitutes a violation of the agreement.[13] The National Labor Relations Board has reached the same conclusion. *W. L. Mead, Inc.*, 113 N. L. R. B. 1040. We approve that doctrine.[14] To hold otherwise would obviously do violence to accepted principles of traditional contract law. Even more in point, a contrary view would be completely at odds with the basic policy of national labor legislation to promote the arbitral process as a substitute for economic warfare. See *United Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574.

---

[12] It appears that this would be true whether the dispute be considered as a "difference as to the true interpretation of this agreement" or as a difference "between the employer and the employee" under Article XIV of the contract. See p. 96, *supra.* The union not only now concedes that the dispute as to Welsch's discharge was subject to final and binding arbitration, but, indeed, after the strike, the dispute was so arbitrated.

[13] See *Local 25, Teamsters Union* v. *W. L. Mead, Inc.*, 230 F. 2d 576, 583–584 (C. A. 1st Cir.); *United Construction Workers* v. *Haislip Baking Co.*, 223 F. 2d 872, 876–877 (C. A. 4th Cir.); *Labor Board* v. *Dorsey Trailers, Inc.*, 179 F. 2d 589, 592 (C. A. 5th Cir.); *Lewis* v. *Benedict Coal Corp.*, 259 F. 2d 346, 351 (C. A. 6th Cir.); *Labor Board* v. *Sunset Minerals*, 211 F. 2d 224, 226 (C. A. 9th Cir.).

[14] Deciding the case as we do upon this explicit ground, we do not adopt the reasoning of the Washington court. Insofar as the language of that court's opinion is susceptible to the construction that a strike during the term of a collective bargaining agreement is *ipso facto* a violation of the agreement, we expressly reject it.

What has been said is not to suggest that a no-strike agreement is to be implied beyond the area which it has been agreed will be exclusively covered by compulsory terminal arbitration. Nor is it to suggest that there may not arise problems in specific cases as to whether compulsory and binding arbitration has been agreed upon, and, if so, as to what disputes have been made arbitrable.[15] But no such problems are present in this case. The grievance over which the union struck was, as it concedes, one which it had expressly agreed to settle by submission to final and binding arbitration proceedings. The strike which it called was a violation of that contractual obligation.

*Affirmed.*

MR. JUSTICE BLACK, dissenting.

The petitioner local union and the respondent company entered into a written collective bargaining agreement containing an express provision for the arbitration of disputes growing out of differences as to the proper application of the agreement in the following terms:

> "Should any difference arise between the employer and the employee, same shall be submitted to arbitration by both parties. Failing to agree, they shall mutually appoint a third person whose decision shall be final and binding."

The Court now finds—out of clear air, so far as I can see— that the union, without saying so in the agreement, not only agreed to arbitrate such differences, but also promised that there would be no strike while arbitration of a dispute was pending under this provision. And on the

---

[15] With respect to such problems, compare *United Mine Workers* v. *Labor Board,* 103 U. S. App. D. C. 207, 257 F. 2d 211, with *Lewis* v. *Benedict Coal Corp.,* 259 F. 2d 346 (affirmed on this question by an equally divided Court, 361 U. S. 459), for differing interpretations of an identical contract.

basis of its "discovery" of this additional unwritten promise by the union, the Court upholds a judgment awarding the company substantial damages for a strike in breach of contract.

That the Court's decision actually vacates and amends the contract that the parties themselves had made and signed is shown, I think, by the very face of that original contract. The arbitration provision covering disputes growing out of the application of the contract immediately follows another quite different arbitration provision—one covering disputes "as to the true interpretation of this agreement" in the following terms:

> "Should any difference as to the true interpretation of this agreement arise, same shall be submitted to a Board of Arbitration of two members, one representing the firm, and one representing the Union. If said members cannot agree, a third member, who must be a disinterested party shall be selected, and the decision of the said Board of Arbitration shall be binding. *It is further agreed by both parties hereto that during such arbitration, there shall be no suspension of work.*" (Emphasis supplied.)

In view of the fact that this latter provision contains an explicit promise by the union "that during such arbitration, there shall be no suspension of work," it seems to me plain that the parties to this contract, knowing how to write a provision binding a union not to strike, deliberately included a no-strike clause with regard to disputes over broad questions of contractual interpretation and deliberately excluded such a clause with regard to the essentially factual disputes arising out of the application of the contract in particular instances. And there is not a word anywhere else in this agreement which indicates that this perfectly sensible contractual framework for handling these two different kinds of disputes was not

intended to operate in the precise manner dictated by the express language of the two arbitration provisions.

The defense offered for the Court's rewriting of the contract which the parties themselves made is that to allow the parties' own contract to stand "would obviously do violence to accepted principles of traditional contract law" and "be completely at odds with the basic policy of national labor legislation to promote the arbitral process." I had supposed, however—though evidently the Court thinks otherwise—that the job of courts enforcing contracts was to give legal effect to what the contracting parties actually agree to do, not to what courts think they ought to do. In any case, I have been unable to find any accepted principle of contract law—traditional or otherwise—that permits courts to change completely the nature of a contract by adding new promises that the parties themselves refused to make in order that the new court-made contract might better fit into whatever social, economic, or legal policies the courts believe to be so important that they should have been taken out of the realm of voluntary contract by the legislative body and furthered by compulsory legislation.

The mere fact that the dispute which brought about this strike was subject to "final and binding" arbitration under this contract certainly does not justify the conclusion that the union relinquished its right to strike in support of its position on that dispute. The issue here involves, not the nature of the arbitration proceeding, but the question of whether the union, by agreeing to arbitrate, has given up all other separate and distinct methods of getting its way. Surely, no one would suggest that a provision for final and binding arbitration would preclude a union from attempting to persuade an employer to forego action the union was against, even where that action was fully within the employer's rights under the contract. The same principle supports the right of the

union to strike in such a situation for historically, and as was recognized in both the Wagner and Taft-Hartley Acts, the strike has been the unions' most important weapon of persuasion. To say that the right to strike is inconsistent with the contractual duty to arbitrate sounds like a dull echo of the argument which used to be so popular that the right to strike was inconsistent with the contractual duty to work—an argument which frequently went so far as to say that strikes are inconsistent with both the common law and the Constitution.

The additional burden placed upon the union by the Court's writing into the agreement here a promise not to strike is certainly not a matter of minor interest to this employer or to the union. The history of industrial relations in this country emphasizes the great importance to unions of the right to strike as well as an understandable desire on the part of employers to avoid such work stoppages. Both parties to collective bargaining discussions have much at stake as to whether there will be a no-strike clause in any resulting agreement. It is difficult to believe that the desire of employers to get such a promise and the desire of the union to avoid giving it are matters which are not constantly in the minds of those who negotiate these contracts. In such a setting, to hold—on the basis of no evidence whatever—that a union, without knowing it, impliedly surrendered the right to strike by virtue of "traditional contract law" or anything else is to me just fiction. It took more than 50 years for unions to have written into federal legislation the principle that they have a right to strike. I cannot understand how anyone familiar with that history can allow that legislatively recognized right to be undercut on the basis of the attenuated implications the Court uses here.

I do not mean to suggest that an implied contractual promise cannot sometimes be found where there are facts and circumstances sufficient to warrant the conclusion

that such was the intention of the parties. But there is no factual basis for such a conclusion in this case and the Court does not even claim to the contrary. The implication of a no-strike clause which the Court purports to find here—an implication completely at war with the language the parties used in making this contract as well as with the normal understanding of the negotiation process by which such contracts are made—has not been supported by so much as one scrap of evidence in this record. The implication found by the Court thus flows neither from the contract itself nor, so far as this record shows, from the intention of the parties. In my judgment, an "implication" of that nature would better be described as a rigid rule of law that an agreement to arbitrate has precisely the same effect as an agreement not to strike—a rule of law which introduces revolutionary doctrine into the field of collective bargaining.

I agree that the Taft-Hartley Act shows a congressional purpose to treat collective bargaining contracts and agreements for arbitration in them as one important way of insuring stability in industrial production and labor relations. But the fact that we may agree, as I do, that these settlements by arbitration are desirable is no excuse whatever for imposing such "contracts," either to compel arbitration or to forbid striking, upon unwilling parties. That approach is certainly contrary to the industrial and labor philosophy of the Taft-Hartley Act. Whatever else may be said about that Act, it seems plain that it was enacted on the view that the best way to bring about industrial peace was through voluntary, not compelled, labor agreements. Section 301 is torn from its roots when it is held to require the sort of compulsory arbitration imposed by this decision. I would reverse this case and relegate this controversy to the forum in which it belongs—the collective bargaining table.