JERSEY CENTRAL POWER & LIGHT COMPANY, A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT, v. LOCAL UNION No. 1289 OF THE INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued June 5, 1962—Decided July 2, 1962.

96

*Mr. Howard T. Rosen* argued the cause for plaintiff-appellant.

*Mr. Samuel Weitzman* argued the cause for defendants-respondents (*Messrs. Weitzman, Brady & Weitzman,* attorneys).

The opinion of the court was delivered by

WEINTRAUB, C. J. Plaintiff (herein the Company) sued to compel defendants (herein the Union) to arbitrate a dis-

pute under the collective bargaining agreement between them. The trial court entered judgment for the Union. We certified the Company's appeal before the Appellate Division considered it.

For a number of years the parties disagreed upon whether under their agreements the Company had the right on a permanent basis to change the work schedules of men required for maintenance work in its power plants, so as to assign them for work at times other than 8 A. M. to 4:30 P. M., Monday through Friday. The dispute relates to compensation for such work. The Company insists the pay should be at straight-time rate (plus nighttime differential where applicable) for the first eight hours, whereas the Union contends the pay must be at a premium rate.

In the negotiations for the contract here involved the parties were unable to resolve this recurring dispute. The relevant provisions of the earlier contract were repeated without change, but in a "Statement of Principle" presented to the Union's representative, the Company reiterated its view of their proper construction and said it "agrees to extend the present language applicable to scheduling maintenance into the new contract with the understanding that it is not conceding the merits of the issue or its interest in ultimately reaching its goal."

In the trial court the Union contended successfully that there was no merit whatever to the Company's position and hence arbitration should not be ordered. Before us the Union advances the further propositions that the arbitration provision does not embrace the dispute even if the dispute is meritorious, and that the quarrel is now moot because the contract expired during the pendency of the appeal.

I.

We will first consider the Union's position that the dispute, even if meritorious, does not come within the terms of the arbitration provision. As we have said, this

issue is tendered for the first time on appeal. Indeed the Union now disputes what it conceded in its answer to the complaint.[1]

Section 8.22 of the contract reads:

"In the event the Company desires to make complaint in connection with this agreement, it shall do so, and if no satisfaction is obtained from the Local Union involved within ten (10) days, the Company shall refer the matter to the System Council. If, within fifteen (15) days, thereafter, the matter remains in dispute, the Company, may, at its option, invoke the grievance procedure set forth herein."

Then follows Article IX, captioned "Grievances and Arbitration," in which appears:

"9.2. Should any dispute arise between the Union and the Company, as to any unadjusted grievance or as to the rights of either party under this agreement, both parties shall endeavor to settle such matters in the simplest and most direct manner. *Any dispute arising from the interpretation of this agreement will be referred for discussion between the Company and the Negotiating Committee of the System Council.* The procedure (unless changed or any steps thereof waived by mutual consent) shall be as follows:" (italics added).

Five steps are then delineated, the last being arbitration.

The Union relies upon the sentence we have italicized. It says that if a dispute arises "from the interpretation of this agreement," the sole grievance procedure is "discussion between the Company and the Negotiating Committee

---

[1] In its answer the Union admitted the following allegations of par. 4 of the complaint:

"Section 9.2 of the agreement provides that if any dispute between the Union and the plaintiff as to the rights of either party under the agreement is not satisfactorily adjusted by the procedure set forth therein, then upon written request therefor by one party filed with the other, there shall be created a Board of Arbitration to be composed of one representative of plaintiff, one representative of the Union and a third member to be selected by the first two; such Board shall consider the matter and render a decision thereon and its decision shall be binding upon the parties."

of the System Council." It adds that the four steps preliminary to arbitration are couched in terms which reflect an employee's grievance and hence the fifth step, arbitration, must also be limited to such grievances.

But this construction would stunt the role of arbitration, for if the italicized sentence bears the meaning for which the Union contends, it would follow that an employee-grievance must also end in "discussion" with the Negotiating Committee if the grievance should involve, as many do, "the interpretation of this agreement." In other words, while the Union would thus restrain the grievance treatment of so much of the first sentence of section 9.2 as speaks of "the rights of either party under this agreement," its view, if sound, must limit as well the grievance procedure with respect to "any unadjusted grievance" referred to in that same sentence. Yet section 9.3(a) plainly reveals that the disputes "respecting the meaning and application of this agreement" are within the purview of the grievance steps, for it provides:

"The Company will recognize as authorized representatives of the Union for purposes of fourth-step discussion of grievances, including intra-term arbitration of disputes respecting the meaning and application of this agreement, the aggrieved employee, the President of each Local Union, the President and the Secretary of the System Council, or their authorized deputies."

██ It seems to us that the italicized sentence of section 9.2 means only that if a dispute should arise from the interpretation of the agreement, the parties shall discuss it at a high policy level, but that if the dispute is not there resolved, the stipulated procedure including arbitration may be pursued. That the parties contemplated wide authority in the arbitrators is fortified by the presence in the contract of an unqualified no-strike and no-lockout provision. It would hardly do to agree not to strike during the period of the agreement without suitable machinery for a peaceful adjustment of disputes involving the interpretation of the contract.

At the oral argument counsel for the Union conceded that if the Company established the schedules it has in mind, there would then follow employee-grievances which could reach arbitration. This concession of course recognizes that a controversy arising from the interpretation of the agreement is not beyond arbitration and is inconsistent, as we have already pointed out, with the construction the Union would attribute to the italicized sentence. But, beyond that, the concession serves to point up the oddity of an interpretation which would require the Company to precipitate an employee-grievance. The object of the grievance procedure is to minimize friction between labor and management, and the course taken by the Company conduces to that end. The sense of the agreement is that the parties will "settle such matters in the simplest and most direct manner," as section 9.2 says, and may resort to arbitration if their own efforts should fail. And we may add that, if there were an ambiguity, we could properly consider that the parties so interpreted the agreement by their conduct prior to the effort first made by the Union on appeal to obtain a different interpretation. See *Michaels v. Brookchester, Inc.*, 26 *N. J.* 379, 388 (1958); *Journeymen Barbers, etc., Local 687 v. Pollino*, 22 *N. J.* 389, 395 (1956).

## II.

The dispute involving as it does a "complaint in connection with this agreement" (section 8.22) and "the rights of either party under this agreement" (section 9.2), a court should without more order the parties to arbitrate it in accordance with their contract. But the Union says a court should not order arbitration of a dispute within the letter of the arbitration provision if the dispute lacks merit. The Union adds that arbitration is no substitute for negotiation at the bargaining table, and stresses the parties' awareness of this controversy when the contract was made. Of course, the contract does not contemplate that a new

agreement may be made by arbitration, but this elementary proposition does not advance the inquiry. The fact remains that there is a dispute upon the rights of the parties, and unless we may inquire into the merits, the agreement to arbitrate must be enforced. The history of the negotiations is simply a matter the arbitrators may consider in deciding the dispute. *Association of Westinghouse Salaried Employees v. Westinghouse Elec. Corp.*, 283 *F.* 2d 93, 95 (3 *Cir.* 1960).

The Union says it should not be found to have agreed to arbitrate groundless disputes, for arbitration would then be an interminable and vexatious experience. But this is merely plausible, for, although vexatious litigation can be defeated, there is no shelter from it. Disputes under contracts are either justiciable or arbitrable. If the arbitration agreement does not apply, the same controversy may be pressed in a declaratory judgment action. A court does not lose jurisdiction merely because a claim is absurd. *New Bedford Defense Prods. Div. v. Local* 1113, *UAW*, 258 *F.* 2d 522, 526 (1 *Cir.* 1958). Thus the parties must face each other in one forum or the other. The question is simply which forum it shall be.

In the last analysis, the Union's position is that arbitrators may be trusted with substantial disputes but not with silly ones, whereas the judiciary is the desirable arena for silly disputes but not for substantial ones. True, the Union says the courts should decide only whether the dispute is frivolous, but to decide that a dispute is frivolous is to decide the merits, albeit the judgment could be only for the defendant. But more than that, such inquiries defeat the very purpose of the agreement to arbitrate. The parties to a collective bargaining agreement contract for the judgment of men steeped in the special history and problems of the economic scene. What to a judge may seem frivolous may to arbitrators be meaningful. Moreover, arbitration is designed to yield a speedy answer, an aim which would be thwarted by preliminary litigation over the forum.

For these reasons the judicial inquiry should not extend beyond deciding whether the dispute is within the agreement to arbitrate. The trial court went beyond that inquiry, in reliance upon *Standard Oil Dev. Co. Employees Union v. Esso Research & Eng. Co.*, 38 *N. J. Super.* 106, 119 (*App. Div.* 1955), affirmed on rehearing 38 *N. J. Super.* 293 (*App. Div.* 1955), and *Milk Drivers, etc., Local 680 v. Cream-O-Land Dairy*, 39 *N. J. Super.* 163, 178 (*App. Div.* 1956), which held that arbitration should be ordered only if the contention advanced by the moving party is reasonably debatable in the mind of an ordinary layman.

The cited opinions of the Appellate Division represent a stage in the development of the subject. Initially there was much judicial resistance to arbitration. In *International Ass'n of Machinists v. Cutler-Hammer, Inc.*, 271 *App. Div.* 917, 67 *N. Y. S. 2d* 317, 318 (*App. Div.* 1947), affirmed mem. 297 *N. Y.* 519, 74 *N. E. 2d* 464 (*Ct. App.* 1947), it was said that "If the meaning of the provision of the contract sought to be arbitrated is beyond dispute, there cannot be anything to arbitrate and the contract cannot be said to provide for arbitration."[2] This was accepted as the "guide" in *Textile Workers Union v. Firestone Plastics Div.*, 6 *N. J. Super.* 235, 237 (*App. Div.*), certif. denied 4 *N. J.* 515 (1950). In *Standard Oil Dev. Co. Employees Union, supra,* the Appellate Division properly observed (38 *N. J. Super.*, at *p.* 115) that "The reluctance of the courts to sanction the arbitration process is a, relic of the past. Now it is recognized as an integral part of

[2] This is no longer the law of New York. Section 1448a of the Civil Practice Act, added by *c.* 346, *L.* 1962, provides:

"In determining any matter arising under this article, the court or judge shall not consider whether the claim with respect to which arbitration is sought is tenable, or otherwise pass upon the merits of the dispute."

This amendment was recommended by the Law Revision Commission (Leg. Doc. (1962) No. 65 (F)), for the express purpose of overruling *Cutler-Hammer*.

our economic life and welcomed as a practical and expeditious means of disposition of industrial disputes." It then sought to minimize the area of judicial inquiry by holding that arbitration should be ordered unless an ordinary layman, acting in good faith, would not seriously advance the claim (*p.* 115).

The question is now before us for the first time. We are satisfied the judiciary may not examine the merits of a dispute which on its face falls within the provision for arbitration in a collective bargaining agreement. This view was firmly adopted in *United Steelworkers of America v. American Mfg. Co.,* 363 *U. S.* 564, 80 *S. Ct.* 1343, 4 *L. Ed. 2d* 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Nav. Co.,* 363 *U. S.* 574, 80 *S. Ct.* 1347, 4 *L. Ed. 2d* 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 *U. S.* 593, 80 *S. Ct.* 1358, 4 *L. Ed. 2d* 1424 (1960); *Drake Bakeries Inc. v. Local 50, American Bakery & Confectionery Workers,* 82 *S. Ct.* 1346 (1962); and see *U. S. Pipe and Foundry Co. v. Amer. Arbitration Ass'n,* 67 *N. J. Super.* 384, 394 *et seq.* (*App. Div.* 1961); and since the Company is engaged in interstate commerce, those decisions are here controlling in any event. *Local* 174, *Teamsters, etc. v. Lucas Flour Co.,* 369 *U. S.* 95, 82 *S. Ct.* 571, 7 *L. Ed. 2d* 593 (1962).

In *American Mfg. Co.* the Court pointed out that section 203(d) of the Labor Management Relations Act, 1947, 29 *U. S. C. A.* § 173(d) states:

"Final adjustment by a method agreed upon by the parties is hereby declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement. * * *"

That policy, the court commented, "can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play" (363 *U. S.,* at *p.* 566, 80 *S. Ct.,* at *p.* 1346,

4 L. Ed. 2d, at p. 1406), for "Arbitration is a stabilizing influence only as it serves as a vehicle for handling any and all disputes that arise under the agreement" (363 U. S., at p. 567, 80 S. Ct., at p. 1346, 4 L. Ed. 2d, at p. 1406). Hence (363 U. S., at pp. 567–568, 80 S. Ct., at p. 1346, 4 L. Ed. 2d, at p. 1407):

"* * * The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious. The processing of even frivolous claims may have therapeutic values of which those who are not a part of the plant environment may be quite unaware."

In *Warrior & Gulf Nav. Co., supra,* the Court said (363 U. S., at pp. 578–579, 80 S. Ct., at p. 1351, 4 L. Ed. 2d, at p. 1415):

"The collective bargaining agreement states the rights and duties of the parties. It is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate. See Shulman, Reason, Contract, and Law in Labor Relations, 68 Harv. L. Rev. 999, 1004–1005. The collective agreement covers the whole employment relationship. It calls into being a new common law—the common law of a particular industry or of a particular plant."

Further (363 U. S., at p. 581, 80 S. Ct., at p. 1352, 4 L. Ed. 2d, at p. 1416–1417):

"* * * But the grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial

self-government. Arbitration is the means of solving the unforesee-able by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement.

Apart from matters that the parties specifically exclude, all of the questions on which the parties disagree must therefore come within the scope of the grievance and arbitration provisions of the collective agreement. The grievance procedure is, in other words, a part of the continuous collective bargaining process. It, rather than a strike, is the terminal point of a disagreement."

Finally the court held that the arbitration provision shall be construed as expansively as its language will permit (363 *U. S.,* at *pp.* 582–583, 80 *S. Ct.,* at *p.* 1353, 4 *L. Ed. 2d,* at *pp.* 1417–1418) :

"* * * Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry under § 301 must be strictly con-fined to the question whether the reluctant party did agree to arbi-trate the grievance or did agree to give the arbitrator power to make the award he made. An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage."

Here the dispute on its face comes within the agreement to arbitrate. That ends the judicial inquiry.

### III.

█ This brings us to the final question whether the controversy is moot because the contract expired during the pendency of the appeal. The claim of mootness rests upon assertions outside the record. The Company in response acknowledges "the parties have signed another one year contract effective as of November 1, 1961" but adds that "all provisions of the 1961–1962 contract pertinent to the

subject matter of this litigation are exactly the same as in the 1960–1961 contract." The Union does not quarrel with the Company's statement. We will accept the issue of mootness upon the basis of the Company's concession.

The Union relies upon the provision in Article IX that the decision of the board of arbitration "shall be binding upon the Company and the Union for the duration of this agreement."

There is no express time limitation in the contract upon the authority of the arbitrators. If an employee complained of a wrong committed during the contract period, a suitable remedy could be awarded after the contract had terminated. See *United Steelworkers of America v. Enterprise Wheel & Car Corp., supra* (363 *U. S.* 593, 80 *S. Ct.* 1358, 4 *L. Ed. 2d* 1424); *Botany Mills, Inc. v. Textile Workers Union of America, AFL–CIO,* 50 *N. J. Super.* 18, 28 (*App. Div.* 1958). Here, however, the relief sought can have but prospective impact, since the Company claims only a right to do something not yet done. The Union accordingly argues that since the decision would be binding only "for the duration of this agreement," the authority of the arbitrators lapsed with the theoretical ending of the contract period in which the processing of the dispute began.

Perhaps, as the Company contends, the meaning of the phrase "for the duration of this agreement" is for the arbitrators rather than for a court. We need not decide that question. We will accept the Union's view that the issue goes to arbitrability and is for us to decide.

Section 13.1 of the contract provides:

"This agreement shall be effective as of November 1, 1960 and shall remain in effect until October 31, 1961 and from year to year thereafter, unless either party hereto, shall, not less than sixty (60) days prior to any expiration date, notify the other party in writing of its intention to amend specific articles or paragraphs of this agreement, or to terminate the agreement. Changes herein may be made at any time by mutual consent, provided such changes are set forth in writing."

Successive collective bargaining agreements are not isolated transactions but rather are expressions of a continuous relationship between the parties. The provision we have just quoted reflects that sense of continuity, with a reservation in either party of the right to seek a change or to terminate. Here, the agreement was simply renewed or continued with certain changes not pertinent to the dispute. It is understandable of course that the parties did not intend a decision of the arbitrators shall bar them from bargaining thereafter for a different result or principle. But it is something else to say that a dispute in arbitration becomes moot with the expiration of the annual term when the agreement as renewed continues the very provisions implicated in the controversy. So to hold would merely complicate the relationship with procedural niceties which are foreign to the objective of section 9.2 that "both parties shall endeavor to settle such matters in the simplest and most direct manner." It would serve no useful end to require the parties to start anew and to rerun the course, with indeed the power in one party to delay the other by, as we have here found, a wrongful refusal to go to arbitration. In truth the dispute continues, and a decision will be useful and not merely academic.

The judgment is reversed and the matter remanded with directions to enter judgment for plaintiff in accordance with this opinion.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.