**DANNER PRESS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 16699.**

United States Court of Appeals
Sixth Circuit.

March 15, 1967.

Edward C. Kaminski, Akron, Ohio, Herman E. Rabe, Buckingham, Doolittle & Burroughs, Akron, Ohio, on brief, for petitioner.

Robert S. Hillman, N. L. R. B., Washington, D. C., for respondent.

Before WEICK, Chief Judge, and CELEBREZZE and PECK, Circuit Judges.

CELEBREZZE, Circuit Judge.

Petitioner, Danner Press, Inc., (hereinafter referred to as either Petitioner or Danner Akron), seeks review of an order of the National Labor Relations Board. The Board's decision and order are reported at 153 N.L.R.B. No. 87. The Board, adopting the findings of the Trial Examiner, found that Danner Akron violated Section 8(a) (5) and (1) of the National Labor Relations Act by refusing to bargain with the Union [1] concerning its grievance that Danner Akron was assigning struck work to its employees in breach of their collective bargaining contract. The Board also found that the bindery employees of Danner Akron struck in protest against Danner Akron's refusal to bargain, and that Danner Akron violated Section 8(a) (3) and (1) of the Act by discharging and refusing to reinstate these employees when they abandoned their strike and offered unconditionally to return to work.

The record discloses the following facts: Petitioner operates a printing business as a job shop in the City of Akron, Ohio. Petitioner employs seven or eight full-time employees and eleven or twelve part-time employees. Approxi-

---

[1]. International Brotherhood of Bookbinders, Akron Bindery Workers Union, Local No. 5, AFL-CIO.

mately one third of Petitioner's business is derived from Danner Press of Canton, Inc. (hereinafter referred to as Danner Canton), which operates a similar but larger job shop.[2] Local No. 5 of the Bookbinders Union represents the binding employees of both Petitioner and Danner Canton, but in separate bargaining units; and the Union has separate collective bargaining contracts with each Company.

On February 3, 1964, the Danner Canton bookbinders' bargaining unit commenced an economic strike against Danner Canton. A few days after the strike began, both the employees of Danner Akron and Canton believed that Danner Canton was sending strikebound work to Akron for completion by Danner Akron.

Consequently, on February 17, 1964, Mr. Glenn Moss, International Representative of the Bookbinders, and general employees of Danner Canton, talked to Mr. Swineford at the plant of Danner Akron. Mr. Moss testified that he told Mr. Swineford he was there on a grievance in regard to struck work being performed at Danner Akron. Mr. Swineford told Mr. Moss and the committee to leave as they were trespassing. Mr. Moss asked Mr. Swineford when he could get his answer on the grievance, and Mr. Swineford said "tomorrow". Mr. Swineford denied that Mr. Moss asked to discuss or arrange a meeting to discuss with him negotiations concerning the performance of struck work in the Akron plant. Mr. Swineford testified that Mr. Moss asked him to shut down the bindery because they were doing struck work for the Canton plant.

On February 18, 1964, a Danner Akron employee arranged a meeting with Mr. Swineford and with Mr. Moss and Mr. Thur, President of Local No. 5. Mr. Moss, Mr. Thur and several employees of Danner Canton again met with Mr. Swineford. The same views of the conversation and the same result followed as in the meeting the previous day.

After this short meeting of February 18th, the bindery employees of Petitioner met with Petitioner's President Underman. Mr. Underman told his employees they had a contract and were obligated to do all the work or they would have to get out. Several employees told Mr. Underman they were doing struck work, and asked him why he would not meet with their Union officials.

On February 19, 1964, Danner Canton employees began picketing Danner Akron. Most of Petitioner's employees refused to cross the picket line. Later that day, and until March 16, 1964, Petitioner's employees remained out on strike and picketed Petitioner's plant until the Danner Canton strike was settled. Neither the International nor the Local was aware of, or took any part in the placement of the original picket line at the Danner Akron plant on the morning of February 19th.

On March 16th, all the striking employees of Petitioner appeared at the plant to start their first shift. Mr. Swineford informed them they had been discharged and replaced.

The evidence of struck work was also conflicting. In September, 1963, Petitioner purchased a McCain machine for their bindery. Because of the large capacity of this machine, and the heavy capital investment, Petitioner agreed to purchase the machine with the understanding that Danner Canton would send more bindery work to Petitioner.

Approximately one-third of Petitioner's bindery work during 1963 came from Danner Canton. From February 1, 1963 to March 31, 1964 Petitioner did 400 jobs for Danner Canton. Bindery work done for Danner Canton in February, 1963, totaled $861.51, in March, 1963, $7,042.41, in February, 1964, $5,966.42, and March, 1964, $2,480.52.

After the strike began at Danner Canton on February 3rd, the bindery operated only for one shift instead of the normal three shifts. The bindery was not

2. While there are ties of management and ownership between the two Companies, the two Companies do not constitute a single employer for purposes of the Act.

operating at full capacity. On January 30, 1964, Danner Canton received material from Allied Graphic Arts to print and bind a spring and summer catalogue. The proofs were scheduled to go out on January 30th, but did not go out until February 3rd. The proofs came back on February 5th and the job went to press on February 7th. Binding was scheduled to start February 10th. Since the bindery work could not be done in time, the overflow went to Danner Akron. Approximately 1,300,000 pieces were run in Canton and approximately 300,000 pieces were run in Akron.

Mr. Hoffman, Customer Service Representative of Danner Canton, who testified to the above facts, was asked the following questions by the Trial Examiner:

"Q. With only one bindery shift working and with orders on hand which required prompt attention, was there any overflow work caused by this strike which resulted in your shipping work to Akron to be done?

"A. On any given job or all jobs?

"Q. On any job?

"A. Yes."

Immediately the Customer Service Representative was asked by Petitioner's counsel on re-direct examination:

"Q. Mr. Hoffman, with regard to these orders that you had said were to be processed for Canton after February 3rd during the time that the strike was in progress, was the work that was sent to Akron in the nature of overflow work as you have testified?

"A. Yes, it was.

"Q. And are you able to say whether or not this work that went to Akron on the Atkins catalogue job would probably have gone there had there been no strike in the plant at Canton?

"A. Yes.

"Q. —Do you know of your own knowledge, whether the work which was sent to Akron from Canton, which I believe you characterized as overflow, was sent to Akron because of the strike

that was in effect in the bindery at Canton?

"A. No, I do not."

Early in the proceeding before the Trial Examiner, a lengthy discussion developed between counsel and the Trial Examiner as to the nature of the charge against the Petitioner. The General Counsel for the National Labor Relations Board finally took the position they were trying the case on the theory that the Petitioner failed to bargain on a matter which had not been the subject of previous bargaining, rather than on the theory that the Petitioner failed to negotiate a grievance. The nature of the unfair labor practice charge was crystalized in the following colloquy between the Trial Examiner and counsel:

"Trial Examiner: Now tell me are you definitely ruling this projected theory concerning which I had heard comment from you earlier, namely that by the assignment of struck work to employees that the Respondent was violating the provisions of the contract that it would not require the employees to violate their constitution or by-laws?

"Mr. Szabo: That is correct. We are not.

"Trial Examiner: You are not pursuing it. So that this case may proceed as though this may never have been said by you?"

The Trial Examiner then found that Petitioner violated Section 8(a) (5) and (1) of the Act by refusing to accept and negotiate the grievance of struck work, and that a finding that Petitioner assigned struck work to its employees was not essential to this holding. The Trial Examiner further found that the employees struck in protest of this unfair labor practice, and that the Petitioner violated Section 8(a) (3) and (1) of the Act by discharging and refusing to reinstate these employees when they offered to return to work.

The pertinent provisions of the collective bargaining contract between Danner

Akron and the Union required the parties

"(1) To appoint a Joint Standing Committee for the Conciliation, consisting of two representatives appointed by the Employer, and two representatives appointed by the Union, to which shall be referred all questions which may arise as to the construction to be placed on any section of this Contract, except as provided otherwise herein or alleged violations thereof, which cannot be settled otherwise herein, and such Joint Standing Committee shall meet when any question of difference shall have been referred to it for decision by the executive officers of either party to this Agreement.

"(2) To present immediately in writing any grievance to the Joint Standing Committee for conciliation. The Committee shall meet to consider any grievance within 48 hours after notice in writing has been filed by either party to the other party. Differences as to scales of wages shall not be considered to be grievances. If an understanding cannot be reached within ten full business days after the grievance has been presented, then the settlement of the grievance shall be left to a Board of Arbitration."

The bargaining contract provided for certain procedures by which grievances were to be presented and settled. The record discloses these procedures were not followed. The meetings on February 17th and 18th with Danner Akron included the International Representative of the Union, the Local President of the Union and four employees of Danner Canton. No employees of Danner Akron were present at either meeting. No written grievance was presented to Danner Akron.

■ The Board now takes the position that Petitioner's contention that the Union failed to file its grievance in accordance with the provisions of their collective bargaining agreement is foreclosed by the express declaration of Petitioner's counsel that it was not defending the alleged refusal to bargain on this ground. The position of waiver is not well taken. This statement was made prior to the clarification sought by Petitioner's counsel as to exactly what issues were being tried. Furthermore, this contention should not be available to the General Counsel when the Trial Examiner found that Petitioner refused to negotiate a grievance after the General Counsel said that issue was not in the case.

The confusion, which still persists, as to the nature of the Board's charge would not have arisen had the provisions of the contract been followed. The parties agreed to an exclusive method of procedure for the presentation of grievances and unless the aggrieved party can show a waiver of such contract procedures, no relief can be obtained where that procedure was not followed. If this procedure had been followed, no question would have arisen as to the nature of the Union's claim, and the matter may have been settled, or ultimately resolved by the intended and preferential method of arbitration. What was said by the Board in W. L. Mead, Inc., 113 N.L.R.B. 1040 (1955) and approved by the Supreme Court in Local 174, Teamsters, Chauffeurs, etc., of America v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1961), as to the duty to arbitrate, is equally applicable here:

"Every encouragement should be given to the making and enforcement of such clauses. But, if employees may effectively call upon the Board to protect them when they arbitrarily breach clear and binding arbitration clauses of this kind, and turn to the use of economic force for the settlement of grievances rather than to the contractual, quasi judicial procedure, the effect will be to discourage the making of, and the adherence to, contractual arbitration procedures. To hold that a strike in furtherance of such a material breach of a clear and binding contractual arbitration clause is to be protected by this Board would be contrary to the labor policy embodied in the National Labor Relations Act as

interpreted by the Courts of Appeals and the Supreme Court."

We can see no difference between the failure to abide by the contractual requirement to arbitrate and the contractual requirement to follow certain procedures in the presentation of a grievance. See also Midwest Metallic Products, Inc., 121 N.L.R.B. 1317 (1958); and Sohio Chemical Co., 141 N.L.R.B. 810 (1963). While this may appear to be a harsh rule, it is necessary to maintain the integrity of the contract and to provide a uniform and orderly method for settlement of grievances.

The Trial Examiner found that when the picketing of Danner Akron began by Danner Canton employees on February 19th, the failure of Danner Akron employees to enter the plant and work was not due to their employer's refusal to bargain but out of sympathy with Danner Canton's employees. Thus the initial walkout and the refusal to cross the picket line was found by the Trial Examiner not to be in protest of the Petitioner's refusal to entertain a grievance. The Trial Examiner then found that after February 19th, the Danner Akron employees continued to strike because Petitioner refused to meet and negotiate their grievance of struck work, and they then became unfair labor practice strikers.

If the employees of Petitioner were not unfair labor practice strikers when they refused to return to work, we do not see how a change in attitude or motive could cure the defect of their failure to follow the requirements of their contract. We find no evidence in the record that a grievance was filed in accordance with the provisions of the contract. Danner Akron had no obligation to discuss with the employees of Danner Canton a claimed grievance pertaining to the employees of Danner Akron. Nor was petitioner obligated by its contract to accept a grievance from the Danner Canton Union committee.

Since the employees did not follow the grievance procedure, and did not present a grievance in writing, their use of economic force could not be protected under the Act as an unfair labor practice strike. Local 174, Teamsters, Chauffeurs, etc., of America v. Lucas Flour Co., supra. It follows that the Company did not commit an unfair labor practice in hiring replacements for the striking employees.

The Order of the Board is set aside and enforcement is denied.