**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**STATE ELECTRIC SERVICE, INC., Respondent.**

No. 72–3477

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

April 19, 1973.

Rehearing Denied June 14, 1973.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Charles M. Paschal, Director, Region 15, N. L. R. B., New Orleans, La., for petitioner.

Lynn C. Higby, Panama City, Fla., for respondent.

Before GEWIN, COLEMAN and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

The National Labor Relations Board in this case seeks enforcement of its order against respondent State Electric Service, Inc. The Board's decision and order of July 31, 1972, is reported at 198 N.L.R.B. No. 77. The Board found that the company violated sections 8(a)(5) and (1) of the National Labor Relations Act by refusing to abide by a contract negotiated and executed in its behalf by a multi-employer association. We find substantial evidence to support

* Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir. 1970, 431 F.2d 409, Part I.

the Board's holding and grant enforcement of its order.

For several years State Electric had been a member of a multi-employer bargaining group which negotiated contracts with Local 1001 of the International Brotherhood of Electrical Workers. The 1969–70 contract was set to expire on September 13, 1970. By August 21, 1970, agreement had been reached on a contract for the next year, to be effective on September 14th. This agreement was executed by the association (Panama City Electrical Contractors) and the union.

During August 1970, a dispute arose between the union and State Electric. This dispute centered on which contractual wage rate—the industrial rate or the lower commercial rate—was to be paid on a certain small electrical job at Tyndall Air Force Base. The company maintained that the lower commercial rate was applicable while the union felt otherwise. Evidence shows that the union business manager attempted several times to discuss the matter with State Electric's president, Peterson, but received no response. On August 20th, in light of the failure of response from Peterson, the business manager instructed the employees not to work the next day on the Tyndall job. The union members did not work on the job again thereafter. On August 26th, Peterson fired all of his employees and hired replacements.

■ The issue in this case is whether or not the work stoppage by the employees was sufficient to justify State Electric's termination of the contract for 1969–70, and its refusal to abide by the contract effective September 14, 1970, for 1970–71. The Board held that State Electric was bound by both contracts.

The contracts for both of the two above periods contained "no strike" clauses, but these clauses differ significantly. The 1969–70 agreement contained a no strike clause which provided:

There shall be not (sic) stoppage of work either by strike or walkout because of any proposed changes in the agreement.

The contract effective on September 14th, for the next year, expanded the no strike clause to read:

There shall be no stoppage of work either by strike or walkout because of any proposed changes in the agreement or dispute over matters relating to this agreement.

At the same time, both contracts contained a broad arbitration clause:

During the term of this agreement all questions or disputes shall be taken up for adjustment between the duly selected representatives of both parties to this agreement.

If the representatives of the parties could not agree, the contracts provided for binding arbitration.

The work stoppage in question occurred while the 1969–70 contract with the circumscribed no strike clause was in effect. It is uncontroverted that the work stoppage was not over proposed changes to the agreement. The union has contended that its work stoppage was simply an attempt to force State Electric to discuss or arbitrate the wage dispute. The facts establish that president Peterson failed to respond to numerous telephone requests from the union for a meeting. On August 14th, the union sent a letter to Peterson requesting a labor-management representative meeting as required by the arbitration section of the agreement. When no response was forthcoming in six days, the work stoppage occurred. The union did, finally, unilaterally invoke the grievance procedure in September, 1970. Peterson was notified by registered mail of the meeting of the joint conference committee but failed to reply or appear. The committee, consisting of both contractor and union representatives, found that *State Electric*, not the union, had violat-

ed the contract by failing to follow the grievance procedure.[1]

Although Peterson met with union officers at various times after this stoppage and arbitration, his union employees did no more work on the job. It apparently is State Electric's position that the work stoppage was a total breach of contract by the union, relieving it of any contractual obligations to the union. Although it never properly withdrew from the multi-employer group, it refused to abide by the contract agreed to by the group and the union.

The NLRB held that the union's work stoppage was not a violation of the contract because of the limited "no strike" clause therein. Therefore, it held the failure to continue to deal with the union was a violation of the Act.

In challenging the NLRB's holding, petitioner State Electric relies on Teamsters Union v. Lucas Flour Company, 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962), for the proposition that a no strike clause is to be implied coextensive with an existing arbitration clause and that a strike over an arbitrable grievance was a violation of the contract. The Supreme Court has seemingly retreated from the full implications of the broad language in *Lucas Flour*. The Court stated in Drake Bakeries v. Local 50, 370 U.S. 254, 261, 82 S.Ct. 1346, 1351, 8 L.Ed.2d 474 (1962):

> However, this Court has prescribed no such inflexible rule rigidly linking no-strike and arbitration clauses of every collective bargaining contract.[7]

The Court then added that it did not think previous cases had established "a flat and general rule that these two clauses are properly to be regarded as exact counterweights in every industrial setting." *Id.*, f.7. Here, of course, un-

like *Lucas Flour*, there was a *bargained-for* no-strike clause which was obviously more limited than the arbitration clause.

Even if *Lucas Flour* does require a coextensive no strike clause here, we see other reasons why the employer cannot prevail. First, as noted, the union made every effort, excluding the unsatisfactory one of forcing unilateral arbitration, to have this matter settled as provided in the contract. Secondly, in *Lucas Flour* the strike was designed to compel the employer to agree to the union's position as a substitute for the contractually agreed to arbitration. In the present case, however, the work stoppage was unquestionably designed simply to force the company to acknowledge the existing dispute and to make the company comply with the contract by arbitrating the matter. It is unchallenged that the union was not attempting to use the stoppage mechanism to force the employer's acquiescence to an issue which the arbitrator could decide, rather it was solely in response to the employer's refusal to abide by the very clause which he now claims the union has breached. Thus, this is not "a strike to settle a dispute which a collective agreement provides shall be settled exclusively and finally by compulsory arbitration" as was the case in *Lucas Flour*, 369 U.S. at 105, 82 S.Ct. at 577.

██ Furthermore, we think it well settled that a union's breach of a no strike clause (assuming there was such a breach in this case) is not automatically sufficient to breach the entire contract. The Supreme Court has held that a union's breach of a no strike clause does not justify an employer's subsequent refusal to arbitrate, as required by the contract, the underlying dispute which gave rise to the stoppage in the

---

1. The opinion of the joint committee includes the following paragraph:

> After consideration discussion and question the committee finds that the local union put forth extra effort and consideration in trying to arbitrate this

matter in good faith and under the terms of this agreement, and at the same time showing the union's regards to Mr. Peterson as an individual and as an employer.

first place. See Packing House Workers v. Needham Packing Company, 376 U.S. 247, 84 S.Ct. 773, 11 L.Ed.2d 680 (1964); Drake Bakeries, Inc. v. Bakery & Confectionery Workers, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962). If a breach of a no strike clause is not enough to relieve the employer of his duty to arbitrate the issue giving rise to the illegal work stoppage, it can certainly not automatically be held that a breach of a no strike clause terminates the entire contract with the union. Here, assuming that the union did indeed breach its obligation by calling the stoppage, under the circumstances of this case that does not seem sufficient to justify the employer's position that the entire contract was rendered void. As noted here, there is a serious question as to whether the work stoppage was an illegal work stoppage within an *implied* no strike clause based on the *Lucas Flour* decision. At most, it would seem the employer only had an action against the union for any damages growing out of the stoppage or a suit for a possible injunction under *Boys Markets*.[2] In fact, even here there is a strong argument that the employer's only course of action would require his filing a grievance and resorting to arbitration over whether or not this was an illegal work stoppage.

The employer chose not to attempt any of these "peaceful" remedies. Rather, it appears he simply decided to take this opportunity to rid himself of the union once and for all. After consideration of all the evidence, we find ample support for the Board's conclusion that State Electric never effectively repudiated or withdrew from the multi-employer bargaining unit so as to not be bound by the contract to become effective on September 14th. Therefore, the order of the NLRB in this case is

Enforced.

2. Boys Markets, Inc. v. Local 770, Retail Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed. 2d 199 (1970).