BEAUNIT OF PUERTO RICO, Petitioner, *v.* PUERTO RICO LABOR RELATIONS BOARD, Respondent.

No. JRT-66-2. Decided May 6, 1966.

---

*Fiddler, González* and *Rodríguez,* and *Juan R. Torruella del Valle* for petitioner. *J. B. Fernández Badillo, Solicitor General, Luis M. Rivera Pérez,* and *Celia Canales de González* for the Labor Relations Board.

First Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Hernández Matos, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

Petitioner is a domestic corporation which manufactures textiles and operates in interstate commerce. On December 18, 1962 it signed a collective bargaining agreement with the Seafarers International Union of North America, Atlantic, Gulf, Lakes and Inland Water District, Puerto Rico Division, AFL-CIO. The agreement was contracted for two years and it would expire on December 18, 1964.

Said agreement contains, among others, the usual clauses in this kind of contract: checkoff union shop, arbitration of labor disputes by means of a grievance committee, working hours, wage scale, welfare plan, etc.

Before the bargaining agreement expired on October 21, 1964, due to a consent election held among the workers of the employer, petitioner herein, another union, the "Unión de Trabajadores de la Beaunit de Puerto Rico, Inc., Independiente," won the election. The election was administered by the National Labor Relations Board. The new union was certified as the workers' representative on October 29, 1964.

When the replacement of the workers' representative took place, neither the employer nor the new union repudiated the existing agreement, but on the contrary, the employer continued paying the wages established in the agreement entered into with the Seafarers, retained the coffee break, and subsequently paid the vacations as accumulated by the workers in accordance with the provisions of the same agreement. Although the new representative was certified on October 29, 1964, the union and the employer did not meet to initiate a new bargaining agreement until the middle of December of that year, at which time the prior agreement expired.

On November 30, 1964 the employer discharged employee Modesto Escribano Lugo. On December 2 of that year, the new representative, the Unión de Trabajadores de Beaunit de Puerto Rico, Inc. requested in writing a meeting of the Grievance Committee to hear the case of Escribano Lugo's discharge. The employer rejected the request alleging that from the moment the new Union was certified, the collective agreement signed with the Seafarers had expired and that therefore, it was not bound to discuss the discharge of Escribano Lugo.

After the usual proceedings—filing of charge, issuance of complaint, public hearing, etc.—the Puerto Rico Labor Relations Board, through its Decision and Order of December 21, 1965, found Beaunit guilty of unfair practice in violating the agreement by refusing to argue the discharge of the employee Modesto Escribano Lugo before the Grievance Committee. Consequently, it ordered Beaunit, (1) to cease from violating the agreement in question, as well as the one it might sign in the future with the Unión de Trabajadores de la Beaunit, and (2) to meet with the Union's representatives to discuss the discharge of Escribano Lugo.

Before us petitioner (1) denies the jurisdiction of the Puerto Rico Labor Relations Board to take cognizance of this controversy, and (2) on the merits, it reiterates its position in the sense that it is not bound to discuss the discharge of Escribano Lugo before the Grievance Committee because when the new union was certified the existing agreement—which provides for said arbitration—was "automatically rescinded".

■ The jurisdictional problem posed has already been decided. In *Labor Relations Board* v. *I.L.A.*, 73 P.R.R. 568 (1952), we held that the violation of collective bargaining agreements not being an unfair labor practice under the Federal Act but it being so under the Puerto Rico Act, the Puerto Rico Labor Relations Board could intervene in cases

of violation of collective bargaining agreements although the cases would involve organizations operating in interstate commerce. Subsequently, in November 1962, we reexamined that doctrine in the light of *Guss* v. *Utah L.R.B.*, 353 U.S. 1; *Amalgamated Meat Cutters* v. *Fairlawn Meats*, 353 U.S. 20, and *San Diego Bldg. Trades* v. *Garmon*, 353 U.S. 26, and sanctioned it in *P.R. Telephone Co.* v. *Labor Relations Board*, 86 P.R.R. 362 (1962). We held the same position in *El Mundo Inc.* v. *L.R.B.*, 92 P.R.R. 814 (1965). The discussion made by the Puerto Rico Labor Relations Board in its opinion in the instant case concerning this jurisdictional question is very well grounded but in view of what we have already stated in *Labor Relations Board* v. *I.L.A.*, *supra*, and in *P.R. Telephone Co.* v. *Labor Relations Board*, *supra*, we do not deem it necessary to discuss again the matter here. See, also, *Dowd Box Co.* v. *Courtney*, 368 U.S. 502, 506–507; *Local 174* v. *Lucas Flour*, 369 U.S. 95; *Sinclair* v. *Atkinson*, 370 U.S. 195; and *Smith* v. *Evening News Assn.*, 371 U.S. 195, all decided in 1962.

We turn now to the other question raised in this case, that is, whether or not the employer was under the obligation to arbitrate before the Grievance Committee the controversy which arose from the discharge of Escribano Lugo.

■ As in *P.R. Telephone Co.* v. *Labor Relations Board*, *supra* at p. 376, we need not decide in the case at bar whether in deciding the question of the unfair practice charged, the Puerto Rico Labor Relations Board ought to apply the federal labor law or the local law, for as respects the specific question under consideration, both coincide since they are founded on the respect due collective bargaining agreements and the efficacy of arbitration. See the authorities cited in 86 P.R.R. 376, footnote 12, and also *Republic Steel* v. *Maddox*, 379 U.S. 650 (1965); *Rivera* v. *Land Authority*, 83

P.R.R. 251, 259 (1961); *Pérez* v. *Water Resources Authority*, 87 P.R.R. 110, 116 (1963).[1]

Nevertheless, it is useful to see what the federal courts have decided in situations similar to the instant case. There are three recent cases very illustrative, which we shall briefly examine.

In *Wiley* v. *Livingston*, 376 U.S. 543 (1964), a new employer refused to arbitrate a complaint by means of the grievance procedures provided by the collective bargaining agreement on the ground that it (the new employer) had not been a party to the bargaining of the agreement which the former employer had signed with the union and for that reason said agreement was not binding upon him. The Supreme Court of the United States decided that the employer was under the obligation to arbitrate. Let us examine this case a little closer.

The union had entered into a collective bargaining agreement with the employer, Interscience Publishers, which would expire on January 31, 1962. The agreement did not contain any express provision making it binding on successors of Interscience. Before the agreement expired, in October 1961, Interscience merged with a much larger concern called John Wiley & Sons, Inc., and Interscience ceased to do business as a separate entity. The practical effect was that the concern Wiley acquired Interscience and consequently, *Wiley* was the new employer of the workers who formerly worked for *Interscience*. A labor-management con-

---

[1] We understand, of course, the need for a uniform interstate legislation, or at least a nonconflicting one in matters governed by the Federal Act. See what has been said in relation to the cases which the federal or state courts should decide under § 301 of the Taft-Hartley Act (29 U.S.C. § 185) in *Wiley* v. *Livingston*, 376 U.S. 543, 548 (1964); *Local 174* v. *Lucas Flour*, 369 U.S. 95, 103 (1962); *Textile Workers* v. *Lincoln Mills*, 353 U.S. 448, 457 (1957).

*Cf.* Aponte-Pérez, *The Culmination of the Commonwealth of Puerto Rico in the Field of Labor Relations and Wage and Hour Standards via Compact Federalism*, 26 *Rev. C. Abo. P.R.* 13 (1965).

troversy emerged concerning several aspects of the agreement. Despite the union's request that the controversy be arbitrated pursuant to the provisions of the agreement, the new employer, Wiley, refused to do so for the foregoing reasons.

It was more difficult to hold, in the case of *Wiley*, that the agreement was binding on employer than it is in the instant case, because, as we have already stated, in the case at bar the new union and the employer continued administering substantially the existing agreement and it was not until the specific controversy about the employee Modesto Escribano arose that the employer alleged that he was not bound by the agreement. On the other hand, in the *Wiley* case there were conversations between the union and the management before and after the change of employer, as to the effect which said change might have on the existing agreement and on the rights of the employees covered by said agreement. These conversations between the Union, Interscience, and Wiley did not produce any agreement on that point. So that although from the beginning the new employer Wiley had challenged the agreement to which it had not been a party, the Court decided that it was bound to arbitrate pursuant to the provisions thereof.

■ Why did the Supreme Court decide as it did? Precisely and specifically, because the case of *Wiley*, as in the instant case, raises a problem which clearly falls within a public policy of utmost importance in the industrialized modern society. The health, safety, and welfare of the inhabitants of modern society depend to a large degree on the normal operation of a number of services and industries and, therefore, to promote, propitiate, and safeguard the industrial peace is a public purpose of vital importance in the federal as well as in the state spheres.

In *Wiley, supra*, the Supreme Court of the United States bears in mind the important role of arbitration in the reali-

zation of labor public policy and that arbitration is the substitute for industrial strife. The Court indicates that "the federal policy of settling labor disputes by arbitration" would be frustrated if the mere fact of the replacement of an employer by another had the automatic consequence of relieving the parties from the duty to arbitrate previously agreed upon. 376 U.S. 549.

The Court reiterates what it calls "the preference of national labor policy for arbitration" and mentions the "impressive policy considerations favoring arbitration". At pp. 549, 550.[2] Already in our jurisdiction we had become aware of the fact that a vigorous judicial backing to the institution of labor-management arbitration and to the complaint and grievance procedures is an effective way of protecting and promoting industrial peace. *Rivera* v. *Land Authority*, 83 P.R.R. 251, 257 (1961); *Pérez* v. *Water Resources Authority*, 87 P.R.R. 110, 116 (1963).

*Wackenhut Corp.* v. *Plant Guards*, 332 F.2d 954 (1964); 56 L.R.R.M. 2466, is the second federal case which we shall discuss. A situation similar to the one in *Wiley* was raised therein. General Plant Protection Co. had signed a collective bargaining agreement with the union. While said agreement was in force Wackenhut Corp. purchased the enterprise. Under the contract of purchase the new employer did not expressly assume the obligations of the collective bargaining agreement in force. Labor-management controversies appeared and the union demanded that Wackenhut submit to arbitration as provided in the agreement. Taking as basis "the policy of the national labor laws" and citing the *Wiley* case, *supra*, the Court decided that the new employer was

---

[2] For discussions of the considerations referred to therein see *United Steelworkers* v. *American Mfg. Co.*, 363 U.S. 564; *United Steelworkers* v. *Warrior & Gulf Co.*, 363 U.S. 574; *United Steelworkers* v. *Enterprise Corp.*, 363 U.S. 593; *Pérez* v. *Water Resources Authority*, 87 P.R.R. 110 (1963).

bound to arbitrate pursuant to the provision of the agreement entered into between the union and the former employer. Judge Hamley, writer of the opinion in this case, expressed that after reading the opinion of the Supreme Court of the United States in the *Wiley* case he was convinced that the decision taken therein did not rest on narrow grounds but that said opinion was based upon a broad view dictated by the policy of the national labor laws. 332 F.2d 958.

■ The Court stated in the said case of *Wackenhut* that the collective bargaining agreement was still binding, notwithstanding that one of the parties had been replaced by another, and it set forth that a substantial similarity of operation and continuity of identity of the business enterprise had been maintained before and after the change. The same happens in the instant case; the representatives of a party have changed but the laborers, the type of operation, and the identity of the enterprise have substantially continued the same.

The third and last federal case which we are going to review in this sense is *United Steelworkers* v. *Reliance Universal Inc.*, 335 F.2d 891 (1964); 56 L.R.R.M. 2721. The collective bargaining agreement in this case governed from September 1962 until July 1964. In September 1963, the employer sold the enterprise to another. Labor-management disputes emerged and the union demanded that the new employer submit to arbitration as agreed upon in the contract. The latter refused and the Court decided that the new employer should arbitrate as provided in the collective bargaining agreement. Here also the Court, through Judge Hastie, writer of opinion, referred to the "strong" federal policy in favor of settlement of labor disputes by arbitration. 335 F.2d 894.

The three cases examined hereinbefore, *Wiley*, *Wackenhut*, and *Reliance*, clearly show that the federal judicial policy on this matter, consistent with the legislative policy, is (1) to enforce the collective bargaining agreements on both parties, and (2) to decidedly back the procedures of arbitration in the solution of labor-management disputes. As we have already set forth, ours is the same.

Petitioner cites in its support two cases dated prior to the ones aforementioned in this opinion, which do not decide the point raised in the instant case. These two cases are *American Seating Co.*, 106 N.L.R.B. 250 (1953) and *Boston Machine Works Co.*, 89 N.L.R.B. 59 (1950).

In *American Seating*, the state of facts and the point involved were different from those of the case at bar. Therein the Board applied the known principle that a collective bargaining agreement of unreasonable duration shall not be a bar to the holding of elections, and decided that the employer refused to bargain with the union, after having been requested by the latter to bargain a contract and that it violated § 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5). As it may be seen the elements of this case are different from those in the instant case.

Likewise, *Boston Machine, supra*, is not applicable to the instant case. A controversy concerning representation was raised therein. The situation in the enterprise concerned reached such a point that the employer did not know with which group it should bargain. In view of the confusion produced as to who was the representative of the workers, the Board directed elections. The Board reached the conclusion that failure to do so would obstruct the collective bargaining process. There the Board expressly refused to decide as to the effect that the election and the certification would have upon the collective bargaining agreement. 89 N.L.R.B. 61.

It is advisable to remember that the public policy of the federal labor relations acts consisting in the promotion of industrial peace (29 U.S.C. §§ 141, 151), and the public policy of Puerto Rico on the same matter, as stated in the Puerto Rico Labor Relations Act, 29 L.P.R.A. § 62, are not only compatible but they are essentially the same. A reading of the abovecited statutes so establishes it. See Barela, The Puerto Rico Labor Relations Act: A State Labor Policy and Its Application, *Editorial Universidad de P.R.* 22 (1965). Therein the author states[3] that "if a single statement summarizes the nature of the Puerto Rican Labor Relations Act, its aims and purposes, it is, . . . the statement by President Franklin D. Roosevelt of July 5, 1935 upon signing . . . the Wagner Act. . . ."[4]

■ The solution given to the problem raised herein by the courts in the cases already cited, *Wiley* v. *Livingston*, *Wackenhut* v. *Plant Guards*, and *United Steelworkers* v. *Reliance, supra*, seems to us rational and convenient to maintain the industrial peace.[5] It seems very reasonable that the mere fact of a replacement of an employer by another, or of a representative of the workers by another, should not automatically abolish the existing agreement between the enterprise and the workers. The contrary would automatically leave the parties without the law among them—the agreement—and would put them immediately in a state of industrial strife. That would be contrary to the social interest—which is in turn the federal public policy and that of Puerto

---

[3] Barela rendered services for three years in the National Labor Relations Board and was Chairman of the Puerto Rico Labor Relations Board for fifteen years.

[4] The President's statement appears in National Labor Relations Board, Legislative History of the National Labor Relations Act, U.S. Gov't Printing Office, Wash. (1949), Vol. II, p. 3269. It is also reproduced in part by Barela in his book, pp. 22–23.

[5] See Smith & Jones, *The Supreme Court and Labor Dispute Arbitration: The Emerging Federal Law*, 63 Michigan L. Rev. 751, 775 (1965).

Rico, sanctioned in the laws and case law—that industrial peace exist.

■ On the contrary, if the mere change of employer or of representative of the employees does not extinguish the agreement, the parties may continue to administer it in peace, as they have been doing until then, and, if they deem it advisable, the parties may always agree to amend it by mutual consent. This would not be oppressive for any of the parties because at any rate neither the National Labor Relations Board nor the Puerto Rico Labor Relations Board protect the effectiveness of agreements of unreasonable long duration. As we have indicated, it is a well-established principle in both jurisdictions that an agreement of unreasonable long duration would not be a bar to an election or to a new bargaining.

■ The continuation of the existing agreement, until it is modified through legal proceedings, guarantees a climate of certainty and peace in the industry. No one would think, for example, that because in a country a political party, which is not the one in control of the government, wins the elections, it means that that country is automatically without laws and that it falls into a chaotic interregnum during which contracts need not be performed nor laws observed until the new government legislates its new laws and codes. The same should rule as to the collective bargaining agreements which are, as a matter of fact, the private law between the workers and management. See *Steelworkers* v. *Warrior & Gulf Co.*, 363 U.S. 574, 578–579; Cox, *Reflections Upon Labor Arbitration*, 72 Harv. L. Rev. 1482, 1498–1499 (1959); Shulman, *Reason, Contract and Law in Labor Relations*, 68 Harv. L. Rev. 999, 1004–1005 (1955).

■ It is also advisable to bear in mind, because it seems to be forgotten, that the unions are not the beneficiaries of the collective bargaining agreements, but that the beneficiaries

are the workers, in such measure as the agreements confer upon them benefits of any kind. The agreement, of course, is a contract between the enterprise and the workers and in order to have permanent success it must provide economic benefits to both parties. Except for exceptional consideration, no employee would work gratuitously and no employer will operate for a long term an enterprise which will only bring it losses.

■ The beneficiaries, in the corresponding part, are then the workers and not the unions. The unions and their officers are *the representatives* of the workers. Likewise the enterprises have their representatives who represent them in collective bargaining. The substantive parties in labor-management relations are the workers and the employers and not their respective agents or representatives. The employers are the ones providing the capital and assuming the risk, and the employees are the ones who work and the ones who, by means of their representatives, bargain collectively. In the same manner that the government exists to serve the country and not the country to serve the government, in the same manner that we judges discharge our duties to serve justice and not the reverse, thus the unions also exist to serve the workers and not the workers to serve the unions.

■ There remains to be considered a last point raised by petitioner. It states that even assuming that the employer were bound to arbitrate, arbitration does not lie because the union did not completely comply with the proceeding established in the agreement to take matters to the Grievance Committee. Such an objection is not valid. The union requested the petitioner in writing that the controversy concerning the discharge of employee Escribano Lugo be argued before the Grievance Committee. Nevertheless the employer's position was that it would not do so because there was no existing agreement because the latter had expired. In view

of such a situation it would have been futile on the part of the union to comply with some procedural particulars when it already knew beforehand the negative position of the employer on that score. These proceedings prior to arbitration do not function in a vacuum; they function according to the facts of the case and we have already seen which were the facts. Identical contention was made in *Wiley, supra,* and it was decided in the same manner we are doing herein. 376 U.S. 555–556.

Petitioner's petition for review will be denied and judgment will be rendered enforcing the Decision and Order of the Board in this case, insofar as it has the effect of ordering that the controversy concerning the discharge of Escribano Lugo be argued before the Grievance Committee.