No. 86-37

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

ALBERT L. BRINKMAN,

       Plaintiff and Appellant,

   -vs-

STATE OF MONTANA, STATE OF MONTANA
INSTITUTIONS, and HENRY RISLEY,
Warden, Montana State Prison,

       Defendants and Respondents.

APPEAL FROM: District Court of the Third Judicial District,
In and for the County of Powell,
The Honorable Robert Boyd, Judge presiding.

COUNSEL OF RECORD:

     For Appellant:

         Leonard J. Haxby & David L. Holland, Butte, Montana

     For Respondent:

         Chris D. Tweeten, Agency Legal Services Bureau,
Helena, Montana

     For Amicus Curiae:

         Charles E. Erdmann, Montana School Boards Assoc.,
Helena, Montana
LeRoy H. Schramm, Montana University System, Helena,
Montana

Submitted on Briefs: June 6, 1986

Decided: December 11, 1986

Filed: DEC 11 1986

_____
Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Plaintiff Albert Brinkman appeals a Powell County District Court order granting summary judgment to the defendants State of Montana, State of Montana Department of Institutions and Warden Henry Risley in this wrongful termination of employment case. The sole question on appeal is whether the appellant is barred from suing for wrongful discharge because of his failure to exhaust contractual remedies under a collective bargaining agreement. We answer in the affirmative and, therefore, we affirm.

In 1982, appellant worked as a correctional officer at the Montana State Prison. In June of that year, appellant suffered an injury on State property at the prison. He applied for and received workers' compensation benefits for his injuries. Subsequently, he took leave several times from his job citing a continuing disability from his accident. The Department of Institutions has a written policy on industrial accidents. The policy specifies certain rules and procedures covering injured workers, their absences from work, their return to work and protection for their jobs in the interim. In certain situations, the policy requires a worker to submit request for leave forms and a medical statement to the employer to protect the worker's right to return to work.

In July 1983, appellant had been on leave from work continuously for several months. On July 8, 1983, Prison Personnel Officer John Pemberton sent appellant a letter requesting that appellant complete the acompanying request for leave forms and return those forms with a doctor's statement to the prison administration. The letter stated

2

that a job would be held for appellant until December 18, 1983, if appellant returned the requested items by July 22, 1983. Further, the prison would consider appellant on unauthorized leave and, therefore, terminated if he did not return the requested items by then. Appellant testified by deposition that no request for leave forms were enclosed with the letter. His wife testified that a prison employee verbally extended the deadline until July 31, 1983, and assured her that request for leave forms would be sent to appellant. Appellant's wife further testified that the forms were never received. In any event, it is undisputed that appellant did not provide the items to the prison by July 22 or July 31, 1983.

On August 10 or 11, 1983, appellant and his wife went to the prison carrying a doctor's statement releasing appellant to return to work. Prison employees informed appellant that he had been fired and that he could not be allowed inside the prison main gate. At that time, appellant attempted to contact his union representative, Mr. Beatty, who was apparently then working inside the prison. A prison employee, Osborne, called Beatty for appellant and informed appellant that Beatty could not come for twenty to thirty minutes. Appellant waited for Beatty for about forty minutes. Osborne then called Beatty again at appellant's request. Beatty said he would arrive to talk with appellant in ten minutes. He failed to arrive within ten to fifteen minutes and Osborne again called him. Osborne called Beatty an unspecified number of times until appellant, feeling uncomfortable and embarrassed, finally left. Appellant concedes that he did not again try to contact his union in any way about the termination of his employment.

3

In September 1981, after appellant was hired to work at the prison, he signed a form authorizing the prison to deduct union dues from his paycheck and remit them to the Montana Public Employees Association (MPEA). An affidavit submitted by the MPEA's staff counsel shows that the prison deducted union dues from appellant's paycheck during all of 1982 and the first three months of 1983. The affidavit states that:

> [T]he fact that Albert Brinkman's union dues were not paid for the months April, May, June, July and August of 1983 would not disqualify Brinkman from receiving the benefits of the collective bargaining agreement, including its grievance and arbitration procedure, if Brinkman was considered to be an employee of the prison during that time.

Pemberton, the prison personnel officer, filed an affidavit stating that:

> Permanent employees who take leave without pay status continue to be considered employees of Montana State Prison until their resignation, retirement, or discharge. Albert Brinkman was considered to be an employee until the time of his discharge.

Appellant admitted in his deposition that he belonged to the regular state prison union.

In March 1983, the MPEA and the state entered into a collective bargaining agreement (CBA) which governed the conditions of employment at the prison. Article II, section five of that agreement states:

> The Employer may discharge any employee with permanent status only for just cause. The Employer shall furnish an employee subject to discharge or suspension with a written statement of the grounds and specific reason(s) for such actions and shall in addition notify the Association of the removal of an employee for cause. An employee with permanent status may appeal his/her dismissal, suspension or other punitive disciplinary action through the grievance procedure. This in no way limits

4

> management's prerogative to lay off
> employees in accordance with Article 13.

Article X, section four of the CBA provides:

> Any grievance or dispute which may arise
> between the Parties, involving the
> application, meaning, or interpretation
> of this Agreement, shall be settled in
> the following manner . . .

The agreement then lists specific steps that an employee should proceed through, with the help of his union, to resolve the grievance. The agreement ultimately provides for final and binding arbitration.

Other than appellant's attempts on August 10 or 11 to contact his union representative, he did not follow the grievance procedure set out in the CBA. In December 1983, appellant filed his complaint in the Powell County District Court alleging (1) that the prison administration fired him in retaliation for his work-related injury, thus violating public policy, and (2) the prison fired him in violation of an implied covenant of good faith and fair dealing. The complaint named the State of Montana, the Montana Department of Institutions, and Warden Henry Risley as defendants. After extensive pre-trial discovery, the defendants moved for summary judgment. The lower court granted summary judgment to defendants holding that appellant was barred from further proceedings in court because of his failure to exhaust contractual remedies. This appeal followed.

> The standard of review is clear. Summary
> judgment is only proper under Rule 56(c),
> M.R.Civ.P., where the record discloses
> that no genuine issue of material fact
> exists and the moving party is entitled
> to judgment as a matter of law.

Mutual Service Cas. Ins. Co. v. McGehee (Mont. 1985), 711 P.2d 826, 827, 42 St.Rep. 2038, 2039-2040.

Initially we find that, contrary to appellant's assertion, the CBA clearly covered the terms of appellant's employment at the time of his termination. Appellant conceded in response to a request for admission that he authorized the prison to deduct union dues from his paycheck. Appellant also testified in deposition that he was a member of the "regular prison union." The MPEA's counsel filed an affidavit stating that appellant was covered by the CBA so long as he was considered a prison employee. The prison personnel officer filed an affidavit stating that appellant was considered an employee up until the time of his termination. There is no issue of fact on this point which would preclude summary judgment.

Section 39-31-101, MCA, enacted to establish the official state policy on collective bargaining, states:

> In order to promote public business by removing certain recognized sources of strife and unrest, it is the policy of the state of Montana to encourage the practice and procedure of collective bargaining to arrive at friendly adjustment of all disputes between public employers and their employees.

Section 39-31-306, MCA, and § 39-31-310, MCA, also deal with CBAs and are especially relevant to the instant case. Section 39-31-306, MCA, states:

> (1) Any agreement reached by the public employer and the exclusive representative shall be reduced to writing and shall be executed by both parties.
>
> (2) An agreement may contain a grievance procedure culminating in final and binding arbitration of unresolved grievances and disputed interpretations of agreements.
>
> (3) An agreement between the public employer and a labor organization shall be valid and enforced under its terms when entered into in accordance with the provisions of this chapter and signed by

the chief executive officer of the state or political subdivision or commissioner of higher education or his representative. A publication of the agreement is not required to make it effective.

(4) The procedure for the making of an agreement between the state or political subdivision and a labor organization provided by this chapter is the exclusive method of making a valid agreement for public employees represented by a labor organization.

Section 39-31-310, MCA, states:

Nothing in 39-31-307 through 39-31-310 prohibits the parties from voluntarily agreeing to submit any or all of the issues to final and binding arbitration, and if such agreement is reached, the arbitration shall supersede the factfinding procedures set forth in those sections. An agreement to arbitrate and the award issued in accordance with such agreement shall be enforceable in the same manner as is provided in this chapter for enforcement of collective bargaining agreements.

In interpreting the Montana statutes on collective bargaining for public employees, this Court has looked to the federal courts' construction of the National Labor Relations Act. Small v. McRae (1982), 200 Mont. 497, 651 P.2d 982, In Small, a college dean dismissed the plaintiff as chairman of the college English department. Although a CBA covered the employment relationship, the plaintiff filed suit in district court without first pursuing his remedies under the CBA. This Court stated:

Only in those cases where it is certain that the arbitration clause contained in a collective bargaining agreement is not susceptible to an interpretation that covers the dispute is an employee entitled to sidestep the provisions of the collective bargaining agreement. (Citation omitted.)

7

Small, 651 P.2d at 986.  The arbitration clause in this CBA is certainly susceptible to an interpretation covering appellant's dispute.  The CBA states that:

> An employee with permanent status may appeal his/her dismissal, suspension or other punitive disciplinary action through the grievance procedure.

The affidavit of the MPEA's counsel states that "MPEA processes grievances based on allegations of discharge without just cause and has done so under this agreement."  Thus, under the quote from Small (immediately above), appellant is not entitled to sidestep the provisions of the CBA.

In Small we also quoted with approval from a United States Supreme Court case:

> "As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress.  If the union refuses to press or only perfunctorily presses the individual's claim, differences may arise as to the forms of redress then available.  (Citations omitted.)  But unless the contract provides otherwise, there can be no doubt that the employee must afford the union the opportunity to act on his behalf.  Congress has expressly approved contract grievance procedures as a preferred method for settling disputes and stabilizing the 'common law' of the plant.  (Citations omitted.)
>
> "Union interest in prosecuting employee grievances is clear.  Such activity compliments the union's status as exclusive bargaining representative by permitting it to participate actively in the continuing administration of the contract.  In addition, conscientious handling of grievance claims will enhance the union's prestige with employees.  Employer interests, for their part, are served by limiting the choice of remedies available to aggrieved employees.  And it

8

> cannot be said, in the normal situation, that contract grievance procedures are inadequate to protect the interests of an aggrieved employee until the employee has attempted to implement the procedures and found them so. (Emphasis supplied.)

> "A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. In addition to cutting across the interests already mentioned, it would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation 'would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements.' (Citations omitted.)"

Small, 651 P.2d at 986; quoting from Republic Steel Corporation v. Maddox (1965), 379 U.S. 650, 652-653, 85 S.Ct. 614, 616-617, 13 L.Ed.2d 580, 583-584.

This Court went on to say that,

> To allow a member of the collective bargaining unit to completely sidestep available procedures would, just as under federal law, exert a disruptive influence upon both the negotiation and administration of collective bargaining agreements and effectively deprive employers and unions of the ability to establish a uniform and exclusive method for the orderly settlement of employee grievances.

Small, 651 P.2d at 986.

Other courts have addressed the same tort alleged here (wrongful retaliatory discharge for filing a workers' compensation claim) and held that the plaintiff's suit was barred for failure to exhaust contractual remedies. See, e.g., Schuyler v. Metropolitan Transit Com'n. (Minn.App. 1985), 374 N.W.2d 453; Payne v. Pennzoil Corp. (Ariz.App.

9

1983), 672 P.2d 1322. We hold that under the _Small_ decision appellant is similarly barred.

In Malquist v. Foley (Mont. 1986), 714 P.2d 995, 43 St.Rep. 270, this Court expressed sentiments which may be construed as in conflict with our holding today. Therefore, we find it appropriate to analyze and harmonize the _Malquist_ decision. In _Malquist_, three union electricians and their union local sued several companies alleging the companies blacklisted the individuals and seeking punitive damages under § 39-2-803, MCA, entitled "Blacklisting prohibited." This Court reversed the district court's holding that the plaintiffs' suit was pre-empted by federal labor law. In holding that the plaintiffs could pursue their claims in state court, we adopted the following rationale from the Ninth Circuit Court of Appeals;

> "A claim grounded in state law for wrongful termination for public policy reasons poses no significant threat to the collective bargaining process; it does not alter the economic relationship between the employer and employee. The remedy is in _tort_, distinct from any contractual remedy an employee might have under the collective bargaining contract. It furthers the state's interest in protecting the general public--an interest which transcends the employment relationship. (Citation omitted.)"

_Malquist_, 714 P.2d at 999, quoting Garibaldi v. Lucky Food Stores, Inc. (9th Cir. 1984), 726 F.2d 1367, 1375. The quote from _Garibaldi_ was not crucial to the holding in _Malquist_. In _Malquist_, exhaustion of contractual remedies was not at issue because the plaintiffs' union determined that the CBA did not cover the conduct complained of.

Nevertheless, the _Garibaldi_ language runs contra our holding today on the plaintiff's claim for wrongful discharge

10

in violation of public policy. However, subsequent federal cases have limited the broad language used in Garibaldi.

A brief analysis of federal law is appropriate at this point. Section 301 of the federal Labor Management Relations Act (LMRA), 29 U.S.C. § 185, gives jurisdiction to federal district courts over suits for violations of CBAs covering employees in an industry affecting commerce. Section 301 preempts state court claims alleging violations of those defined CBAs. Allis-Chalmers Corp. v. Lueck (1985), _____ U.S. _____, 105 S.Ct. 1904, 85 L.Ed.2d 206. Section 301 also preempts many state court claims alleging torts which arise out of violations of CBAs.

In Garibaldi, the court held that although the plaintiff was covered by a CBA, § 301 did not preempt his state court claim alleging wrongful discharge against public policy. The plaintiff claimed that "he was discharged because he reported a shipment of adulterated milk to the health officials after his supervisors ordered him to deliver it." Garibaldi, 726 F.2d at 1374. Although the Garibaldi passage quoted in Malquist (above) seems to allow any state law claim for wrongful discharge in violation of public policy (even though there is a CBA subject to federal jurisdiction), the Ninth Circuit has subsequently reexamined that idea.

In Olguin v. Inspiration Consol. Copper Co. (9th Cir. 1984), 740 F.2d 1468, the plaintiff alleged he was discharged (1) in violation of an agreement of employment between himself and the company, and (2) in violation of public policy, i.e., in retaliation for safety complaints and for engaging in concerted labor activity. Olguin originally filed his complaint in state court relying mainly on state

11

tort law.  The defendant removed the case to federal court claiming federal labor law controlled.  The Ninth Circuit affirmed the federal district court rulings which (1) denied a motion to remand to state court, (2) found that all claims arose under federal law which provided exclusive remedies, and (3) dismissed Olguin's complaint because he had failed to follow procedures in the collective bargaining agreement which his union had entered into.  Addressing the claim of wrongful discharge in violation of an agreement of employment, the Ninth Circuit stated:

> Like the personnel policy manual, any independent agreement of employment could be effective only as part of the collective bargaining agreement.  That agreement explicitly provides for dismissal on just cause.  Even if the "wrongful discharge" is based on state tort law, it is preempted.  The agreement provides the same or greater protection of job security that state tort law seeks to provide for nonunionized employees; accordingly federal law preempts state law.  (Citation omitted.)  Olguin's alleged right not to be dismissed without just cause is essentially equivalent to a right created by the collective bargaining agreement.  It is apparent that the true nature of Olguin's wrongful discharge complaint concerns the terms and conditions of employment as they are set out in the collective bargaining agreement.

Olguin, 740 F.2d at 1474.

As to the claim for wrongful discharge in violation of public policy, the court said:

> A tort of wrongful discharge has developed in some states to protect employee job security despite the historical common law rule of employment at will.  (Citation omitted.)  As we have indicated, this tort is supplanted by the provisions of the collective bargaining agreement.  (Citation omitted.)

Olguin, 740 F.2d at 1475.  The court declined to apply the Garibaldi exception to the federal preemption doctrine.

12

The most telling case is Evangelista v. Inlandboatmen's Union of Pacific (9th Cir. 1985), 777 F.2d 1390. Plaintiff Evangelista filed suit in state court alleging, among other things, wrongful discharge in violation of public policy. The public policy asserted was the protection of citizens from harassment on the job. The court held that the claim was preempted by federal law since the resolution of the claim turned upon an interpretation of a collective bargaining agreement. The court clarified the Garibaldi decision by stating that in that case

> [w]e reasoned that a state claim for wrongful termination poses no significant threat to the collective bargaining process where it furthers a state interest in protecting the general public which transcends the employment relationship. (Emphasis supplied.)

Evangelista, 777 F.2d at 1401.

Here, appellant's claims (that he was discharged in violation of (1) public policy, and/or (2) the implied covenant of good faith and fair dealing) do not further a state interest in protecting the general public which transcends the employment relationship. There is a state interest here but it is completely and inexorably intertwined with the employment relationship. The CBA in this case protects an employee from discharge without just cause and provides for grievance procedures to enforce that protection. Therefore, appellant's tort claims pose a significant threat to the collective bargaining process and, as such, they are barred.

A federal district court decision, Costello v. United Parcel Service, Inc. (D.C. Pa. 1984), 617 F.Supp. 123, supports our holding today. In Costello, the plaintiff was discharged from his job and his union filed a grievance

13

protesting the discharge. The union pursued the grievance through arbitration until the claim was finally denied. Costello then filed suit in state court alleging, among other things, wrongful discharge in violation of public policy, i.e., in retaliation for filing a workers' compensation claim. The action was removed to federal court on the basis of assertions of diversity and federal question jurisdiction. The court dismissed the claim holding that the plaintiff's exclusive remedy was provided by § 301 of the National Labor Relations Act, generally the exclusive remedy for violations of collective bargaining agreements. The court, relying on Olguin, stated:

> [T]he Commonwealth of Pennsylvania has a legitimate interest in upholding the proper enforcement of its workers compensation laws, and thus in providing a remedy against retaliation for filing a compensation claim. But vindication of that interest is not significantly impeded by § 301 preemption. The "public policy" involved is directly related to the employment relationship itself. Plaintiff is attempting to sue his employer for damages for wrongful discharge, a matter governed entirely by the collective bargaining agreement.

Costello, 617 F.Supp. at 124-125.

The United States Supreme Court case Allis-Chalmers Corp. v. Lueck (1985), ___ U.S. ___, 105 S.Ct. 1904, 85 L.Ed.2d 206, is also relevant here. The plaintiff there was a union member subject to the terms of a CBA. The CBA incorporated a group health and disability plan and provided a grievance procedure for any insurance related dispute arising from the CBA. Plaintiff sued Allis-Chalmers and Aetna Life and Casualty Company, the insurance plan administrator, in state court for breach of the duty to act in good faith and deal fairly with plaintiff's disability

14

claims. Plaintiff did not attempt to grieve the dispute first. The Supreme Court of Wisconsin, in Lueck v. Aetna Life Ins. Co. (Wis. 1984), 342 N.W.2d 699, held that plaintiff's suit was not preempted by federal law or subject to dismissal for failure to exhaust contractual remedies. The United States Supreme Court reversed holding that § 301 of the LMRA preempted the state court claim. The Court stated:

> Perhaps the most harmful aspect of the Wisconsin decision is that it would allow essentially the same suit to be brought directly in state court without first exhausting the grievance procedures established in the bargaining agreement. The need to preserve the effectiveness of arbitration was one of the central reasons that underlay the Court's holding in Lucas Flour. . . . The parties here have agreed that a neutral arbitrator will be responsible, in the first instance, for interpreting the meaning of their contract. Unless this suit is pre-empted, their federal right to decide who is to resolve contract disputes will be lost.
>
> Since nearly any alleged willful breach of contract can be restated as a tort claim for breach of a good-faith obligation under a contract, the arbitrator's role in every case could be bypassed easily if § 301 is not understood to pre-empt such claims. Claims involving vacation or overtime pay, work assignment, unfair discharge --in short, the whole range of disputes traditionally resolved through arbitration--could be brought in the first instance in state court by a complaint in tort rather than in contract. A rule that permitted an individual to sidestep available grievance procedures would cause arbitration to lose most of its effectiveness . . . as well as eviscerate a central tenet of federal labor-contract law under § 301 that it is the arbitrator, not the court, who has the responsibility to interpret the labor contract in the first instance. (Citations omitted.) (Emphasis supplied.)

15

<u>Allis-Chalmers</u>, 105 S.Ct. at 1915-1916. This case supports our decision to prevent appellant from sidestepping the grievance procedure.

Lastly, we find there is an additional reason barring appellant's claim for wrongful discharge in violation of the covenant of good faith and fair dealing. In this case, the CBA provided that the employer could only discharge employees for "just cause." Therefore, we will not imply the covenant of good faith and fair dealing into this employment relationship. We agree with the reasoning of the First Circuit Court of Appeals in Bertrand v. Quincy Market Cold Storage & Warehouse (1st Cir. 1984), 728 F.2d 568.

> This covenant [of good faith and fair dealing] has generally been implied in contracts of employment "at will." This, however, was not an at will employment contract; the company had negotiated away its right to discharge anyone except for "just cause." Since there is an explicit contractual provision giving the employee greater protection than the implied covenant, there is no need to imply the covenant. <u>See</u> Blades, <u>Employment At Will v. Individual Freedom: On Limiting the Abusive Exercise of Employer Power</u>, 67 Colum.L.Rev. 1404, 1410-13 (1967) (comparing the protections of discharge only for just cause provisions in union contracts with the lack of protection given at will employees).

<u>Bertrand</u>, 728 F.2d at 571.

Moreover, this Court addressed the covenant of good faith and fair dealing in Dare v. Montana Petroleum Marketing Co. (Mont. 1984), 687 P.2d 1015, 1020, 41 St.Rep. 1735, 1739, and stated:

> Whether a covenant of good faith and fair dealing is implied in a particular case depends upon objective manifestations by the employer giving rise to the employee's reasonable belief that he or she has job security and will be treated fairly.

16

Section 39-31-306(4), MCA, provides that:

> The procedure for the making of an agreement between the state or political subdivision and a labor organization provided by this chapter is the exclusive method of making a valid agreement for public employees represented by a labor organization.

Here, the CBA contained the objective manifestations of the employer to the employee about the latter's status. The employer agreed he would not discharge the employee but for "just cause" and, under § 39-31-306(4), MCA, no other covenant need be implied.

In response to the dissenting statement of Hon. Frank B. Morrison, Jr., that this opinion deals a serious blow to organized labor, it should be pointed out that upholding a collective bargaining agreement supports the efforts of organized labor and aids them in their efforts to continue to exist as a vital, necessary force. Statements in that same opinion that the defendant was entitled to summary judgment on the facts seem inappropriate, as the trial judge did not make his ruling on that ground, and the statements are not responsive to the issue on appeal.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

17

Mr. Justice Frank B. Morrison dissents as follows:

I concur in affirming summary judgment because I find no evidence that plaintiff was terminated for filing a workers' compensation claim. If he were so fired a violation of public policy would have occurred and the rationale of Garibaldi cited in the majority opinion would or should control.

The majority opinion guts the law of wrongful discharge as applied to union workers operating under a collective bargaining agreement. The result of this decision handcuffs the state in attempting to prevent unconscionable acts which violate established public policy.

I believe the direction of the Court, perhaps unwittingly, is clear. Greater job security found through a tort remedy, is afforded to non union employees. They can recover noneconomic compensatory damages plus punitive damages while the union employee is left with the less effective grievance procedure. Organized labor has been dealt another serious blow by this decision. And it was all unnecessary as defendant was entitled to a summary judgment on the facts.

Justice.

18

Mr. Justice John C. Sheehy, dissenting:

I dissent from affirming the summary judgment because I find remaining genuine issue of material fact. The employee has maintained in briefs here and below that he was not a member of the employee's association, and therefore not bound by the terms of the agreement executed by the association and management. The employer was required to pay a "service charge" equal to the union dues as a condition of his employment, but the evidence is not clear that the employee had joined the association and thereby agreed that the association was his bargaining agent. I would reverse the summary judgment.

_____
                    Justice