No. 02-178

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 274

CONSTANCE MACKAY and ELISSA ORCUTT,

      Plaintiffs and Respondents,

  v.

STATE OF MONTANA, BOARD OF REGENTS, and
MONTANA UNIVERSITY SYSTEM,

      Defendants and Appellants.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade, Cause No. ADV 2000-330,
The Honorable Thomas M. McKittrick, Judge presiding.

COUNSEL OF RECORD:

      For Appellants:

          Robert F. James, Roger T. Witt, Ugrin, Alexander, Zadick & Higgins, P.C.,
Great Falls, Montana

      For Respondents:

          Elizabeth A. Best, Best Law Offices, P.C., Great Falls, Montana

Submitted on Briefs:  July 17, 2003

Decided:  October 2, 2003

Filed:

_____
Clerk

Justice John Warner delivered the Opinion of the Court.

¶1 The Montana State University College of Technology in Great Falls (COT) appeals denial of its motion for summary judgment, the District Court's directed verdict for Constance MacKay (MacKay) and Elissa Orcutt (Orcutt), as well as several of the court's evidentiary rulings. We reverse and remand with instructions to dismiss.

¶2 We address the following issue on appeal: Did the District Court err in denying COT's motion for summary judgment?

¶3 Because we hold that the District Court erred when it failed to grant the COT's motion, it is unnecessary to address the remaining issues presented by the parties.

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 MacKay and Orcutt are former nursing instructors at the COT. As COT employees, MacKay and Orcutt were covered by the Collective Bargaining Agreement (CBA) between the Montana Board of Regents and COT as the employer and Vocational-Technical Educators of Montana, MFT, AFT, AFL-CIO as the union. Neither MacKay nor Orcutt were members of the union. However, they paid a representation fee to the union as provided for by the terms of the CBA.

¶5 In the spring of 1997, Scott Dion (Dion), a student in COT's nursing program, enrolled in practicum rotations taught by Orcutt. The successful completion of these practicum rotations is required for graduation from the nursing program. During his last rotation, Dion failed Orcutt's class and, therefore, did not graduate from the program as scheduled in June 1997. Dion consequently re-enrolled in Orcutt's practicum rotation in

December of 1997 and failed a second time. His status as a COT student terminated on December 16, 1997.

¶6     It was alleged that during his attendance at COT, Dion intimidated both Orcutt and her supervisor MacKay, COT's Director of Nursing. In 1997, after failing his practicum rotations, Dion had stated that "all hell will break loose" at the COT graduation ceremony and that he would "take care of everyone on the stage." As a result of these perceived threats, COT arranged to have both ceremonies patrolled by plain clothes police. Dion, however, did not attend either graduation. In class, however, a student overheard Dion say that if he ever saw MacKay or Orcutt walking down the street he would run them down in his car. In addition, Dion was seen driving in front of MacKay's home. Five months later, Orcutt obtained a temporary restraining order against Dion. MacKay and Orcutt went to the COT union representative with their fears, however, the union representative did not investigate the matter. They also sought help from the Dean and the Associate Dean of COT. According to MacKay and Orcutt, while the Associate Dean reviewed the matter, she also "pounded her fist on the table" and yelled at them for complaining.

¶7     In March 1998, Dion filed a complaint against COT with the Human Rights Commission (HRC) alleging gender discrimination. He claimed that Orcutt and MacKay both made offensive remarks and discriminated against him. In its defense at the HRC hearing, COT made several statements which, when taken as a whole, reflected COT's belief that Dion had a history of belligerence and aggression during his time at COT. Following a hearing on the matter, the HRC concluded that COT had unlawfully discriminated against

3

Dion by subjecting him to sexual intimidation. MacKay and Orcutt claim that COT's poor preparation for the hearing resulted in the unfavorable HRC ruling.

¶8 Following the HRC proceeding, Dion continued to intimidate MacKay and Orcutt. Both were alarmed when Dion went to the COT campus to distribute literature about the HRC proceeding in September 1999. Orcutt and MacKay continued their attempts to discuss the situation with their supervisors and COT's legal counsel, however, they believed that their concerns fell on deaf ears. In December 1999, MacKay obtained a restraining order against Dion. Ultimately, Orcutt resigned from COT in December 1999, and MacKay resigned the following month.

¶9 In April 2000, MacKay and Orcutt filed a suit against the State of Montana, the Board of Regents and the Montana University System (collectively referred to here as COT). The complaint included the following claims: (1) that COT had negligently failed to provide them a safe working environment; (2) common law constructive discharge; (3) statutory constructive discharge; and (4) breach of the covenant of good faith and fair dealing.

¶10 On September 21, 2001, COT moved for summary judgment on all of MacKay and Orcutt's claims based, *inter alia*, on the ground that the CBA contained a grievance procedure and that they had failed to utilize it. The motion was extensively briefed. A hearing on all the pretrial motions was held in November. After hearing argument, the District Court denied COT's motion. The record contains neither a transcript of the hearing, nor any written order giving the reasons the District Court denied the motion.

¶11 A jury trial on the matter then began in November 2001, and lasted for over two

4

weeks. After the close of the evidence, MacKay and Orcutt moved for a directed verdict, contending that they had established liability as a matter of law. The court granted the motion, holding that the Montana Safety Act, §§ 50-71-201(2), 203(4), MCA, was applicable, and that MacKay and Orcutt were entitled to a directed verdict on negligence under Count 1. The court also directed a verdict on Count 2, common law constructive discharge, and Count 4, violation of the covenant of good faith and fair dealing. The District Court further held that in view of the ruling that common law constructive discharge had been established, Count 3, violation of the Montana Wrongful Discharge From Employment Act did not apply. The question of damages was then submitted to the jury.

¶12 COT filed this timely appeal from the judgment entered in the District Court.

¶13 We hold that the District Court erred in denying COT's motion for summary judgment and that this issue is dispositive.

## STANDARD OF REVIEW

¶14 The standard of review for a grant of summary judgment is *de novo.* This Court will apply the same evaluation as the district court based upon Rule 56, M.R.Civ.P. The moving party must establish both the absence of genuine issues of material fact and entitlement to judgment as a matter of law. *Gonzales v. Walchuk*, 2002 MT 262, ¶ 9, 312 Mont. 240, ¶ 9, 59 P.3d 377, ¶ 9; *Bruner v. Yellowstone County* (1995), 272 Mont. 261, 264, 900 P.2d 901, 903. Once the moving party has met its burden, the opposing party must present material and substantial evidence, rather than mere conclusory or speculative statements, to raise a genuine issue of material fact. *Bruner,* 272 Mont. at 264, 900 P.2d at 903. Our standard of

5

review of a question of law is whether the legal conclusions of the trial court are correct. *Gonzales*, ¶ 9.

## DISCUSSION

¶15 Did the District Court err in denying COT's motion for summary judgment?

¶16 According to COT, the District Court erred in denying its motion for summary judgment given that both MacKay and Orcutt failed to exhaust their remedies under the CBA. COT contends that failure to follow the grievance procedure contained in the CBA bars suit in District Court, and that MacKay and Orcutt should not have been allowed to "sidestep" their CBA remedies.

¶17 MacKay and Orcutt, for their part, contend on appeal that: (a) they were not union members and, therefore, were not required to follow the grievance procedure contained in the CBA; (b) even if they were covered by the CBA, the grievance procedure contained therein was not mandatory; (c) the CBA contains no clear waiver of the right to a jury trial; and (d) they sought assistance from the union but none was forthcoming.

¶18 It is uncontested that MacKay and Orcutt were not members of the union, but that they paid representation fees as required by the CBA. The terms and conditions of employment, and consequently their claims were, however, subject to the terms of the CBA. *See* CBA Article 5, 5.11, A. In their complaint they alleged that they were covered by the CBA. In the pre-trial order, signed by counsel and ordered by the court on November 8, 2001, they contended they were covered by the CBA. The pre-trial order superceded the pleadings. Article 2, 2.1, b. of the CBA provides that the bargaining unit consists of all

6

instructional employees of COT employed for the full academic year. Both MacKay and Orcutt had instructional duties. Article 5, 5.11, A., of the CBA provides that employees covered by the terms of the agreement shall pay either union dues or a representation fee. Both paid such fee. It is, to say the least, clear that MacKay and Orcutt were covered by the CBA.

¶19     Article 1, 1.1, of the CBA provides that a purpose of the agreement is to establish terms and conditions of employment. Article 4, 4.1, of the CBA provides that the employer shall provide employees with a safe place to work. All of the claims at issue relate to safety issues regarding the employment and constructive discharge of MacKay and Orcutt.

¶20     Article 8, 8.1 and 8.2, provide that all grievances are to be subject to said Article 8, entitled "Grievance Procedure and Arbitration;" that a grievance includes a violation of the CBA; and that a grievant is an employee. There can be no doubt that the claims of MacKay and Orcutt are covered by, and that they could have been made the subject of a grievance under the CBA.

¶21     MacKay and Orcutt claim that the grievance procedure in the CBA is permissive and not mandatory as Article 8, 8.8 states that any employee *may* file a grievance. They are correct that the word "may" is permissive and "shall" is mandatory. However, we disagree that use of the word "may" means the grievance procedure is permissive.

¶22     Rather, the grievance procedure in question is mandatory. The CBA provides in pertinent part:

    8.1     GRIEVANCE PROCEDURE
    The purpose of this article is to set forth prompt and efficient procedures *for*

7

*the resolution of all grievances. . . .*

8.2     GRIEVANCE DEFINITIONS
A grievance shall mean an alleged violation, misinterpretation or misapplication of the provisions of this agreement . . . .

. . . .

8.8     PROCEDURES FOR FILING GRIEVANCES
*All grievances must be filed* within twenty-five (25) days after the occurrence of the incident which initiated the grievance, or within twenty-five (25) days after the employee should have reasonably known of the circumstances which gave rise to the grievance. . . . *All grievances* shall be presented in accordance with the grievance procedure set forth below.

> Step 1:     Any employee may file a formal written grievance with the Dean who shall conduct a meeting . . . .
>
> Step 2:     If the grievance is not resolved at Step 1, the grievance may be filed with the President . . . .

[Emphasis added.]

"All," i.e. every, grievance must be filed within 25 days. All grievances must be presented in accordance with the agreed procedures.

¶23     Of course, it is not required that an aggrieved employee file a grievance–she may choose to not file and let the matter drop. The word "may" in Step 1 of the grievance procedure merely means that if an employee does choose to seek a remedy she may do so by filing a formal written grievance with the Dean. *See Bonnot v. Congress of Indep. Unions* (8th Cir. 1964), 331 F.2d 355, 359. Such provision does not mean that use of the grievance procedure is not required. Similarly, if the employee is not satisfied with the result of Step 1, she may or may not utilize Step 2, by filing the grievance with the President. The word "may" in Step 2 does not mean that if the employee is dissatisfied with the result of Step 1

8

she may then opt out of the grievance procedure and file suit. *Cf. Brinkman v. State* (1989), 224 Mont. 238, 243-45, 729 P.2d 1301, 1305-06, *overruled on other grounds by Foster v. Albertsons, Inc.* (1992), 254 Mont. 117, 126, 835 P.2d 720, 726. Therefore, the grievance procedure is not permissive, but is clearly mandatory.

¶24   As an adjunct argument, MacKay and Orcutt claim the CBA merely makes available a permissive grievance procedure as it contains no clear and unmistakable waiver of the right to a jury trial, and thus they were not required to grieve their claims under the CBA. However, the question is actually whether the CBA covers the dispute. We have stated:

> Only in those cases where it is certain that the arbitration clause contained in a collective bargaining agreement is not susceptible to an interpretation that covers the dispute is an employee entitled to sidestep the provisions of the collective bargaining agreement.

*Small v. McRae* (1982), 200 Mont. 497, 504, 651 P.2d 982, 986; *Winchester v. Mountain Line,* 1999 MT 134, ¶ 24, 294 Mont. 517, ¶ 24, 982 P.2d 1024, ¶ 24. Therefore, if the CBA covers the dispute, as is the case here, the CBA should be interpreted as requiring use of the grievance procedure.

¶25   This Court has consistently held that an employee covered by a CBA that contains a grievance procedure must exhaust that remedy before bringing suit. *Small*, 200 Mont. at 504-05, 651 P.2d at 986-87; *Brinkman*, 224 Mont. at 243-45, 729 P.2d at 1305-06; *Irving v. School Dist. No. 1-1A* (1991), 248 Mont. 460, 469, 813 P.2d 417, 422; *Lueck v. United Parcel Serv.* (1993), 258 Mont. 2, 8, 851 P.2d 1041, 1044-45. The purpose of the rule is to encourage arbitration of disputes, and to make the use of grievance procedures in union agreements attractive to both labor and management.

> To allow a member of the collective bargaining unit to completely sidestep available procedures would, just as under federal law, exert a disruptive influence upon both the negotiation and administration of collective bargaining agreements and effectively deprive employers and unions of the ability to establish a uniform and exclusive method for the orderly settlement of employee grievances.

*Small*, 200 Mont. at 504, 651 P.2d at 986; *Brinkman*, 224 Mont. at 245, 729 P.2d at 1306. We decline to depart from the rule requiring exhaustion of the remedies available in a collective bargaining agreement, or more specifically, this CBA.

¶26    In her dissent, Justice Cotter asserts that § 39-31-306, MCA, nevertheless allows MacKay and Orcutt to bring suit in the district court despite the grievance procedure outlined in the CBA.  While MacKay and Orcutt responded to COT's summary judgment motion with that argument in the District Court and COT there replied that the statute was not applicable, MacKay and Orcutt did not raise this issue on appeal.  Under Rule 23(b), M.R.App.P., a respondent must follow Rule 23(a)(4), M.R.App.P., and therefore must present an argument that "contain[s] the contentions of the [respondent] with respect to the issues presented, and the reasons therefor."  *See also Emery v. Federated Foods, Inc.* (1993), 262 Mont. 83, 87, 863 P.2d 426, 429.  Because MacKay and Orcutt did not present the issue of the statute on appeal, we cannot consider it as basis for our decision here.

¶27    Finally, MacKay and Orcutt argue that while they sought the union's help in allaying their fear and safety concerns arising from Dion's threats by bringing them to Union Representative Buer, she did nothing to help, and in fact worked against them.  They claim that because they attempted to get assistance from the union, they are excused from their

10

obligation to file a grievance. However, the procedure clearly states that it is the employee that is to file the grievance. Neither approval nor participation is required from the union. The right and obligation to follow the preliminary grievance procedure rests with the employee. MacKay and Orcutt cannot now blame the union where they did not even attempt to invoke those stages of the grievance procedure that do not require union cooperation. *Cf. Angst v. Mack Trucks, Inc.* (3rd Cir. 1992), 969 F.2d 1530, 1538.

¶28    MacKay and Orcutt, having failed to avail themselves of the remedy available to them through the CBA, are foreclosed from maintaining this suit. The judgment entered in the District Court is reversed and remanded with instructions to dismiss the complaint.


/S/ JOHN WARNER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM RICE


Justice W. William Leaphart, dissenting.

¶29    I dissent.

¶30    According to COT, the District Court erred in denying its motion for summary judgment given that both MacKay and Orcutt failed to exhaust their remedies under the collective bargaining agreement (CBA). This Court agrees with COT that failure to follow the grievance procedure contained in the CBA bars the suit in District Court, and that MacKay and Orcutt should not have been allowed to "sidestep" their CBA remedies.

12

MacKay and Orcutt, for their part, contend that they were not union members and, therefore, were not required to follow the grievance procedure contained in the CBA. They also maintain that, even if they were covered by the CBA, the grievance procedure contained therein was not mandatory.

¶31 Even though the CBA states that "[a]ll grievances shall be presented in accordance with the grievance procedure set forth [in the CBA] below," the first step in the grievance procedure itself states: "Any employee <u>may</u> file a formal written grievance with the Dean. . . ." (Emphasis added.) MacKay and Orcutt submit that the "may" renders the procedure permissive. COT, on the other hand, asserts that the usage of "may" in the CBA is not permissive. In agreeing with COT, this Court relies, in part, on our decision in *Brinkman v. State* (1986), 224 Mont. 238, 729 P.2d 1301, where, according to COT, "this Court enforced a CBA grievance procedure even though the procedure contained the word 'may'." However, upon closer inspection of *Brinkman* and the CBA contained therein, it is apparent that the Court's reliance on that case is misguided. In *Brinkman*, the Montana Public Employees Association and the State entered into a CBA, which provided that "[t]he Employer <u>may</u> discharge any employee with permanent status only for just cause," and that "[a]ny grievance or dispute which <u>may</u> arise between the Parties, involving the application, meaning, or interpretation of this Agreement, shall be settled in the following manner . . ." *Brinkman,* 224 Mont. at 241, 729 P.2d at 1303-04 (emphasis added).

¶32 Generally, the word "may" is commonly understood to be permissive or discretionary; in contrast, "shall" is understood to be compelling or mandatory. *ISC Distributors, Inc. v. Trevor* (1995), 273 Mont. 185, 201, 903 P.2d 170, 1799 (Johnson, District Judge,

13

concurring). While it is technically accurate that in *Brinkman* this Court enforced a CBA containing "may," the use of "may" in that case is entirely distinguishable from the use of "may" in the CBA at bar. In the present CBA, "may" refers to the filing of a grievance; whereas the "may" in *Brinkman* refers to the employer's discharge of the employee. The Court's conclusion that the CBA contains a mandatary grievance procedure is not compelling.

¶33　The Court focuses on the mandatory provisions of the CBA which state that "[a]ll grievances must be filed within twenty-five (25) days after the occurrence . . ." and "[a]ll grievances shall be presented in accordance with the grievance procedure set forth below." These mandatory provisions however, only come into play if one assumes that a disgruntled employee has chosen to invoke the "grievance" procedure. Nothing in the CBA requires that all claims be handled as "grievances" as opposed to being filed in court. In fact, the CBA says that an employee "*may* file a formal written grievance" (step one) and, if the grievance is not resolved at step one, the grievance "*may* be filed with the President." (step two). Thus, the employee has discretion in deciding whether to invoke the "grievance" procedure. If he or she does so, then the mandatory provisions are triggered. If the employee decides not to proceed with a "grievance" under the CBA, he or she is free to file suit in district court.

¶34　Even if MacKay and Orcutt were covered by the CBA, the CBA did not mandate that they comply with its grievance procedure. I would affirm the District Court's denial of COT's motion for summary judgment.

/S/ W. WILLIAM LEAPHART

14

Justice Patricia Cotter and Justice Jim Regnier, dissenting.

We join in the foregoing dissent of Justice Leaphart.

/S/ JIM REGNIER
/S/ PATRICIA COTTER

Justice Patricia O. Cotter dissenting.

¶35    I concur in Justice Leaphart's dissent, and agree with his conclusion that the grievance procedure contained in the CBA was permissive rather than mandatory.  I offer the following arguments in addition to those offered by Justice Leaphart.

¶36    The United States Supreme Court has held that a collective bargaining agreement requirement to arbitrate must be "clear and unmistakable."  In *Wright v. Universal Maritime Service Corp.* (1998), 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed. 2d 361, the Supreme Court vacated the judgment of the Fourth Circuit Court of Appeals to the effect that Wright was compelled to arbitrate his complaint of ADA violations via the procedure set forth in the CBA.  In addressing the plaintiff's right to proceed in a judicial forum, the Court stated:

> We will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.'  More succinctly, the waiver must be clear and unmistakable.

*Wright,* 525 U.S. at 80.  (Internal citations omitted).  The Court concluded that one's right to pursue a cause of action in a judicial forum was sufficiently important to be protected against less than explicit union waivers in a collective bargaining agreement.   And, as addressed below, the right to a judicial remedy is both a statutorily and constitutionally protected right in Montana.

15

¶37    Here, the indication that an employee "may" file a formal written grievance is a far cry from the explicit waiver contemplated by the Supreme Court in *Wright.* Adding to the confusion created by the use of the term "may" is the fact that the CBA contains no "clear and unmistakable" waiver of one's right to pursue a judicial remedy, which is guaranteed under Article II, Section 16 of the Montana Constitution. The very fact that the CBA is susceptible to the two interpretations offered in the Court's Opinion and the dissents underscores the argument made here, for, if the language of the CBA purporting to exclude the right to pursue judicial remedies was "explicit," we would not be at these crossroads now, after a trial and determination of the merits of plaintiffs' claims. Thus, I would conclude that there was no effective waiver of the plaintiffs' right to pursue their cause of action in a court of law contained in the CBA.

¶38    But, there is a far more compelling basis for finding the Court in error. MacKay and Orcutt's right to pursue a judicial remedy here, in lieu of the pursuit of a grievance, is also guaranteed to them by statute. Section 39-31-306(5), MCA, which was relied upon by the plaintiffs in the District Court in their opposition to the State's motion for summary judgment, provides in pertinent part:

> An agreement to which a school is a party must contain a grievance procedure culminating in final and binding arbitration of unresolved and disputed interpretations of agreements. The aggrieved party may have the grievance or disputed interpretation of the agreement resolved either by final and binding arbitration or by any other available legal method and forum, but not by both. After a grievance has been submitted to arbitration, the grievant and the exclusive representative waive any right to pursue against the school an action or complaint that seeks the same remedy. If a grievant or the exclusive representative files a complaint or other action against the school, arbitration seeking the same remedy may not be filed or pursued under this section.

16

This statute clearly and unequivocally gives any aggrieved party with a claim against a school a right of election--grievance or judicial remedy. By filing suit against COT, which is undeniably "a school," MacKay and Orcutt exercised their statutory right to pursue their complaint in a court of law.

¶39 Justice Rice maintains in his Concurring Opinion that § 39-31-306(5), MCA, was "meant" to apply only to local elementary and secondary schools. With all due respect to Justice Rice's legislative recollections, the reliability of which I have no reason to dispute, the statute contains no such limiting language. Section 39-31-306(1), MCA, addresses collective bargaining agreements reached by "public employers," which is defined at § 39-31-104(10), MCA, to include, among others, school boards *and* the Board of Regents. Section 39-31-306(5), MCA, then goes on to carve out a special provision for collective bargaining agreements involving "schools." It only stands to reason that this provision would apply equally to all those "public employers" involving "schools" that are referenced in Chapter 31, including the Board of Regents.

¶40 Moreover, if, as Justice Rice appears to argue, the Legislature did not intend for Title 39, Chapter 31 to apply to public employers that are colleges or universities, it neglected to so inform the Board of Regents. The CBA between the defendant Board of Regents and the union references in more than one location this very title and chapter as setting forth the governing law with respect to their mutual collective bargaining. *See, e.g.,* Article 3.1 of the CBA (management rights set forth in § 39-31-303, MCA, are applicable unless specifically relinquished by the contract), and Article 5.1 (employees shall have the right to freely organize in accordance with § 39-31-301, MCA).

17

¶41 For the foregoing reasons, I submit this Court has erred in concluding that MacKay and Orcutt's cases must be dismissed for their failure to pursue the grievance procedures set forth in the CBA. I strenuously dissent from the decision of this Court to reverse and remand with instructions to dismiss. I would reach the merits of the issues raised on appeal, and I would affirm the directed verdicts for MacKay and Orcutt.

/S/ PATRICIA COTTER

Justice Jim Regnier joins in the foregoing dissent.

/S/ JIM REGNIER

Justice Jim Rice specially concurring.

¶42 I concur with the holding and all of the conclusions reached by the Court and, therefore, have signed the opinion. I write separately to address the legitimate interest expressed by a dissenting opinion in the applicability of § 39-31-306(5), MCA, to this dispute.

¶43 The language of § 39-31-306(5), MCA, was adopted by the Legislature during the 1993 regular session by its enactment of Senate Bill 15, introduced by the late Senator Chet Blaylock. After Senate Bill 15 was introduced, the undersigned, then a state representative, at the request of representatives of the Montana Education Association, and after studying Senator Blaylock's bill, agreed to carry the bill in the House of Representatives.

19

¶44    On its way to passage, the bill followed the convoluted pathway typical for a bill actively lobbied by proponents and opponents.  After passage by the Senate and a hearing in the House Judiciary Committee, I offered amendments to the bill which were adopted by the Judiciary Committee and the full House, but which were rejected by the Senate, sending the matter to Conference Committee.  When neither house yielded to the other's version of the bill in Conference Committee, that Committee was dissolved, and a Free Conference Committee, consisting of Senators Blaylock, Bob Brown and Steve Doherty, and Representatives Linda Nelson, Randy Vogel and myself, was appointed with authority to craft revisions to the bill.  I then offered amendments in free conference which were adopted by the Committee, the full houses, and approved by the Governor.

¶45    The bill, from beginning to end, was an issue of dispute between school teachers and school boards.  The bill was pushed by the MEA, ably represented by Eric Feaver and Phil Campbell, and opposed by the Montana School Boards Association, also well represented by Bob Anderson, and, in the main, the late Bruce Moerer.  After the bill's introduction and its first hearing, the Senate Labor Committee, at the request of Senator John "J.D." Lynch, amended the bill to clarify, among other things, that it applied, not to public sector collective bargaining agreements generally but to "school" agreements.  At no time in the bill's long journey to enactment did legislators discuss or consider the applicability of the provision to schools other than elementary and secondary schools.  The evidence of need for the bill was demonstrated exclusively from the experience of these local schools.

20

¶46　After action by both houses, Governor Marc Racicot solicited my reasoning for supporting the bill. My response to him referenced the pattern of litigation between school teachers and school boards over the issue of forum which was delaying consideration and resolution of local school disputes on their merits–the same evidence considered by legislators during committee hearings.

¶47　I am well aware that *a legislator's* intention does not necessarily constitute *the Legislature's* intention. However, the legislative history to Senate Bill 15, ultimately becoming Chapter No. 582, Laws of Montana (1993), clearly demonstrates that the bill's references to "schools" meant only local elementary and secondary schools. As such, that intention is consistent with the definition of "school" within § 20-6-501, MCA, as an "elementary school" or a "high school."

¶48　The education provisions of the Montana Code Annotated, by both language and structure, refer only to K-12 education when referring to "school." *See generally*, Title 20, Chapters 1 through 20. For example, a "pupil" is defined as a child, between the ages of 6 and 19, who is enrolled in a "school." Section 20-1-101(10), MCA. In contrast, the term "school" is noticeably absent from the Code provisions defining and governing colleges and universities. *See generally*, Title 20, Chapters 1 and 25, and Title 17, Chapter 7. Colleges and universities are specifically referred to in the Code by other names, including "university," "university system," "units," "colleges," and "institutions." *See* § 20-25-101, et. seq., and § 20-25-201, et. seq., MCA. As such, there is no statutory authority for the attempt to incorporate the units of the university system within a statute by virtue of a

21

solitary reference to "school." Indeed, there is only authority for the opposite conclusion, one which is also consistent with the entirety of the legislative history of the matter.

¶49 Senate Bill 15 embodied a very good idea. Perhaps that idea should be extended to collective bargaining agreements involving colleges and universities. However, the Legislature has not yet undertaken to do so, and did not do so by enacting Senate Bill 15 in 1993.

/S/ JIM RICE

22